SLATER v. FEDERAL LIFE INSURANCE CO.

INSURANCE—ACCIDENT INSURANCE—CONJECTURE—EVIDENCE—CAUSE OF ACCIDENT.

Where cause of accident resulting in death of assured rests in pure conjecture, and although there is possibility that he met his death by reason of cause insured against in policy, there is no evidence thereof, verdict in favor of plaintiff, in action on policy, was not warranted.

Appeal from Ionia; Hawley (Royal A.), J. Submitted January 6, 1933. (Docket No. 61, Calendar No. 36,891.) Decided March 1, 1933.

Assumpsit by Eva M. Slater, as beneficiary, against Federal Life Insurance Company, a foreign corporation, on a policy of life insurance. Judgment for plaintiff. Defendant appeals. Reversed, and judgment ordered entered for defendant.

*F. C. Nichols* (*George E. Nichols,* of counsel), for plaintiff.

*Norris, McPherson, Harrington & Waer,* for defendant.

BUTZEL, J. Eva M. Slater, plaintiff, is the beneficiary of a policy issued by the defendant, the Federal Life Insurance Company, to George Slater, now deceased. The policy was issued for an annual premium of $2. An indemnity provision, on which this action is based, provides:

"For loss of life, * * * sustained by the wrecking or disablement of any horse drawn or motor driven car or motorcycle in which the insured is riding or driving or by being accidentally thrown therefrom, including accidents causing death or disability sustained under the conditions specified in this part while using or operating farm wagons, mowers, binders, plows, and other farm machinery which is motor driven or horse drawn, the company will pay the sum of......................$2,000."

Plaintiff claims that assured met his death by being accidentally thrown from a horse-drawn farm wagon which he was using or operating.

At about two o'clock on the afternoon of December 2, 1931, assured was seen driving his team of

horses towards a woods not far from his home. The
team was hitched to a farm wagon, equipped with
a flat rack without sides or ends. The top of this
rack was 38 inches from the ground. Assured had
raised and trained his team, which was about 15
years old. The horses were extremely docile and
quick to start and stop when spoken to, although
decedent generally controlled them with the lines.
The assured himself was six feet two and one-half
inches tall, and evidently able-bodied. On the pre-
vious day and also during the forenoon of the day
on which assured suffered his fatal injuries, he had
been drawing buzz poles, small trees or poles which
were to be sawed into smaller pieces for use as fire-
wood. Within an hour after he had driven into the
woods, he was heard calling, " 'Whoa!' as if he was
in trouble of some kind." His brother-in-law, work-
ing about 40 rods away, heard him call, but made no
attempt to ascertain what the trouble was. About
3 o'clock he was seen driving out of the woods on
the same wagon, which was intact except that a
small sliver had been broken off the right side of
the flat rack. The wood indicated that the break
had been recent, and the testimony shows that it
had not been noticed previous to the accident. A
search at the scene of the accident did not reveal the
missing sliver, and it has never been found. No
one was able to testify whether the break had oc-
curred the day of the accident or previous thereto.
The wagon was not otherwise wrecked or disabled.

A neighbor who saw assured driving out of the
woods and assisted him to his home saw that he was
in bad condition and unable to speak. His left eye
was swollen and his face bleeding. He had a very
severe skull fracture on the left side of his head.
He died two days later without communicating to

anyone the manner in which he had sustained his injuries. There were no eyewitnesses to the accident. Plaintiff claims that assured sustained the skull fracture by being thrown from the wagon.

The following day a number of friends of deceased went to the scene of the accident and examined the premises. One of them testified that he followed the wagon tracks into the woods to the point at which they stopped. They showed that the wagon had been headed toward the northwest and backed up close to a pole of dead black ash. This pole was about 30 feet long, six inches at the butt and about three inches at the top, and very crooked. It was found lying on the ground to the right or east of the wagon track. This pole apparently had broken from its stump some time previous to the accident and had lodged in the crotch of an elm tree located some distance to the northwest. The butt of the pole had embedded itself some 8 or 10 inches in the soft earth, and the furrow in the ground indicated that the butt end must have plowed through the mucky soil for a distance of 12 or 15 feet before striking the roots which evidently halted it in its course. Marks near the butt of the pole indicated that a chain had been attached thereto, and blood on the rear axle of the wagon showed that the deceased must have unhooked the chain from the axle after being struck. Blood and hair were also found on the pole about six feet from the top, and it is evident that the pole fell in an unexpected manner and struck Slater on the head.

Contact of the wheels with a tree stump close to the right side of the wagon, or the sudden encounter of the heavy roots with the butt of the pole, or both, may have brought the wagon to a sudden stop and thrown Slater from his wagon, projecting the pole upon him as he fell feet first. The trial judge

adopted this theory, and rendered judgment in favor of the plaintiff.

It is claimed by appellee that the footprints indicate that deceased was thrown from the wagon and the pole struck him as he lit on his feet. Slater was hit on the left frontal portion of his skull. The pole was found to the right of the wagon and the most reasonable inference is that the pole must have swept from right to left towards the wagon. If the deceased was injured while on the wagon or immediately after he landed on the ground after being thrown, he would have been hit on the right side of the head instead of the left, unless we assume that, instead of facing his team, he was turned toward the rear of his wagon. This would be an unnatural inference. If the blow had come from the left, as assured was driving, it is claimed that there would have been signs where the pole hit the wagon, or it might very possibly have fallen upon him.

The pole was found two to six feet from the wagon track, and assured appears to have fallen close to but to the right of the pole, away from the wagon. How the assured was able to unfasten the chain and drive his team back to the road, after suffering his fatal injuries, is not disclosed by the record and is shrouded in mystery. It may be that a blood clot did not form at once. He did retain his mental faculties sufficiently to enable him to start for home, a docile team doing the rest.

Other theories as to how the accident occurred may be deduced from the facts. It seems quite probable, assuming the wagon had been halted by the stump or roots, that the footprints where deceased landed were caused by his jumping from the wagon, rather than by his being thrown therefrom. It seems also plausible that the decedent may have been directing his team from the ground after the

butt of the pole became caught. The testimony shows that the team was so docile that Slater could direct them by appropriate words.

There are at least four possible explanations of the accident: The assured might have been on the ground directing the team when the accident occurred; he might have been hit while on the wagon, and thus injured solely by the blow, and not as a result of being thrown from the wagon; he might have jumped from the wagon voluntarily and landed on his feet just as the descending pole contacted with his head; or he might have been injured in the manner found by the trial judge. A careful study of the record leaves us absolutely uncertain as to what may have been the actual cause of the accident, and leads us to the conclusion that the judgment was based solely on conjecture. We believe that the inference that deceased did not suffer his injuries by being thrown from the wagon is at least equally as tenable as that advanced by the trial judge. Unaided by the testimony of eyewitnesses or even helpful circumstantial evidence, his conclusion is the result of pure conjecture, and the evidence will not sustain the judgment. *Manning* v. *Railway Co.,* 105 Mich. 260; see, also, *Knapp* v. *Railway Co.,* 114 Mich. 199. Under the circumstances, we must conclude that the evidence does not show that assured met his death from or by reason of any cause insured against by the policy.

The judgment of the lower court is reversed, with costs, without new trial, and judgment entered for the defendant.

McDonald, C. J., and Clark, Potter, Sharpe, North, Fead, and Wiest, JJ., concurred.