## ZOSKI *v.* GAINES.

1. JURY—COURT RULES—JURY TRIAL—DISCRETION OF COURT.
   Jury trial in action by infant for personal injuries *held,* properly denied, where no demand was made therefor in accordance with court rule then in force nor for over three years after commencement of suit (Circuit Court Rule No. 39 [1916], as amended in 1927 [Court Rule No. 33 (1931)]).

2. APPEAL AND ERROR—JURY TRIAL—INFANTS—COURT RULES.
   In action by infant against doctors, that jury trial was denied notwithstanding plaintiff's failure to make timely demand therefor in accordance with court rule then in force *held,* not reversible error where trial as held was not shown not to have been fair and impartial and comments of trial judge clearly indicate his observation and application of established policy of courts to protect the rights of infant litigants (Circuit Court Rule No. 39 [1916], as amended in 1927 [Court Rule No. 33 (1931)]).

3. DISCOVERY—MOTION TO VACATE NOTICE—ISSUES.
   Right to take deposition under Court Rule No. 41 (1931), may be tested by motion to vacate notice, and issue then is whether reasons for notice and information sought disclose *bona fide* need in framing issue or preparing for trial.

4. SAME—DENIAL OF MOTION TO VACATE NOTICE.
   Denial of motion to take deposition pursuant to Court Rule No. 41 (1931), in action by infant against doctors for personal injuries *held,* not reversible error, where order for discovery was not filed until two days before date set for trial, no surprise was claimed nor adjournment asked and good faith motive for the order was not shown from documents produced and testimony of witnesses required by plaintiff's demand.

---

* Continued from Vol. 270.

5. APPEAL AND ERROR—ERROR MUST BE PREJUDICIAL TO BE REVERSI-
BLE.

On review, unless it appears that appellant has been prejudiced
by an order which ought not to have been made, the case will
not be reversed on that account alone.

6. PHYSICIANS AND SURGEONS—EMERGENCY OPERATIONS—INFANTS—
PARENTS' CONSENT—ASSAULT.

Except in very extreme cases, a surgeon has no legal right to
operate upon a child without consent of its parents or guard-
ian, hence, finding of trial court that unauthorized tonsil-
lectomy amounted to an assault in law is not disturbed.

7. SAME—INFANTS—CONSENT TO OPERATION NOT IMPLIED.

Consent to tonsillectomy upon minor may not be implied by
operating surgeon where child was brought to private hospital
by an older brother, also a minor, and operation was per-
formed as requested by written memorandum of city physician,
where parents had repeatedly opposed such operation, they
were not present, and it was not an emergency operation.

8. SAME—TONSILLECTOMY—BLINDNESS—PROXIMATE CAUSE.

Finding of the trial judge in case tried without a jury that
neither an unlawful tonsillectomy performed upon plaintiff, a
minor, nor blow upon his head, received when he fell out of
bed after the operation, was proved by a preponderance of the
evidence to have been the proximate cause of child's subse-
quent blindness is not disturbed since such determination is as
binding upon appellate court as a special verdict of a jury.

9. EVIDENCE—PROBATIVE EVIDENCE—PYRAMIDING THEORIES.

Probative evidence must be something more tangible than mere
pyramiding of theories.

10. PHYSICIANS AND SURGEONS—UNLAWFUL TONSILLECTOMY—BLIND-
NESS—REASONABLE INFERENCE—DAMAGES.

In action by infant for damages for unlawful tonsillectomy, it is
necessary in order to recover for subsequent blindness, that
proof be submitted from which the court, sitting without a
jury, may draw reasonable inference that blindness would not
have occurred but for the unlawful operation or fall from bed
and resultant injury to head.

11. COSTS—APPEAL BY BOTH PARTIES—AFFIRMANCE.

No costs are allowed, where judgment for assault is affirmed and
both parties have appealed.

Appeal from Wayne; Toms (Robert M.), J. Submitted January 16, 1935. (Docket No. 92, Calendar No. 38,045.) Decided April 8, 1935. Rehearing denied May 17, 1935.

Case by Tony Zoski, a minor, by next friend, against Claude B. Gaines and others for personal injuries resulting from the performance of an unauthorized operation and for negligence. From judgment for plaintiff in the sum of $600, both parties appeal. Affirmed.

*Charles A. Svenson* and *Harry Cohen* (*Samuel Shimans* and *John Sklar,* of counsel), for plaintiff.

*Wm. Rolston Brown* and *Rodgers & Dunn,* for defendants.

BUSHNELL, J. In September, 1927, Tony Zoski was a nine and a half year old normal boy, in the fourth grade of his school. There being some suspicion of infected tonsils, he was taken by a visiting nurse to the city physician and later sent to the Shurly Hospital. At the same time there was delivered to the hospital a written memorandum from the city physician requesting the removal of the boy's tonsils and adenoids. The boy went to the hospital on Saturday, September 24, 1927, accompanied by his 15-year old brother Theodore, where his tonsils were removed by Dr. Gaines, an associate of Dr. Shurly. Neither the city physician, Dr. Shurly, Dr. Gaines, nor anyone acting for them, obtained the consent of either parent to operate. They did not know their son was in the hospital until Theodore, apparently frightened by Tony's appearance on his return from the operating room, reported the facts. The father, who appears in this action as next friend, immediately went to the hospi-

tal and remained with the boy until about 9:30 p. m. On Sunday morning he returned, discovered blood on the floor near Tony's bed, dried blood on his face, and a bump on his forehead between the eyes. Tony claims he became frightened during the night because of bleeding from his throat, and when the nurse failed to respond to his cries, tried to get out of bed, struck his head against another bed and then lost consciousness. The father went home to dinner at one o'clock on Sunday when Tony said he was feeling better, returning about three, and remained until nine o'clock. He came back early Monday morning, dressed Tony, who was still weak, and took him home in a taxi.

The record does not disclose any medical attention being required at home for the boy, although he was apparently slow in regaining his strength and suffered from headaches. On the morning of either the 2d or 10th of October (the father claiming the 2d and the hospital records showing the 10th), it was discovered that Tony had become blind. He was immediately again taken to the Shurly Hospital, where he was kept under observation for about six weeks and examined by members of the staff. Drs. Neff, Gaines, Bullock, Hewitt, Parker and others were called in as consultants, in an attempt to ascertain the cause of the blindness. Dr. Walter Parker, according to the records, agreed with the diagnosis of others and noted on the medical chart, "that if vision does not recover in 10 days following onset, recommend sub-temporal decompression." The father, although requested by Dr. Shurly, refused to consent to the operation required to remove the intra-cranial pressure, which was thought to be the cause of the blindness, and the boy has since remained completely blind. Neither the headaches nor

any other impairment of any bodily function afterwards appeared.

Plaintiff's claim for damages is predicated upon two theories: First, that the operation being unauthorized by the parents, or either of them, was in law an assault and battery for which damages may be assessed.

Second: that the blindness is the result of the unauthorized operation and should be considered by the court as a factor in determining the amount of damages.

The trial court found that the operation was unlawful and the defendants were, therefore, guilty of an assault, but that the blindness which developed after the operation could not be traced back to such operation; that the operation could not be considered as having either a causal or precipitating relationship to the blindness, and plaintiff was, therefore, not entitled to recover any damages for such blindness. The court allowed damages for the unlawful assault in the amount of six cents, but in a supplemental opinion changed the damages from six cents to $600.

Plaintiff appeals, alleging seven grounds of error, which may be grouped as follows:

1. Where the infant's representative neglects to file demand for jury trial within the time required by the rule, should the infant be denied a jury trial?

2. Where the defendants at all times retained in their sole possession all charts and data relative to treatment and operation upon the infant, symptoms, subsequent history, X-rays, diagnosis and care, should application by infant for examination of defendants and for charts and records prior to trial under Court Rule No. 41 (1931), be quashed?

3. Were defendants guilty of assault and battery by reason of the unauthorized operation upon plaintiff?

4. Was there sufficient causal relationship between operation, the post-operative care, and blindness to entitle plaintiff to damages therefor?

Defendants, in a cross-appeal, state the following additional question:

"Where a city physician without first obtaining the parent's consent, issues a formal order to a private hospital to operate and the operation is performed in reliance upon that order and without any knowledge upon the part of the hospital authorities or the operating surgeon of such lack of consent, may the latter properly assume that the city physician had obtained the necessary consent before issuing the order for the operation?"

Court Rule No. 33 (1933), formerly Court Rule No. 33 (1931), and Circuit Court Rule No. 39 (1916, as amended in 1927), provides for a written demand for trial by jury, either attached to or noted upon the declaration, or, as would have been required prior to the 1931 rule, filed with the clerk within 10 days after the issue is joined in the cause. Plaintiff argues that when this suit was instituted in 1929 the rule relative to filing of written demand for jury trial was not uniformly enforced; it was the custom in tort cases to order a jury, even though not demanded, and calls attention to *Murphy* v. *Wayne Circuit Judge,* 249 Mich. 438. Plaintiff's counsel have, however, overlooked our subsequent determination in *Griffin* v. *Railroad Co.,* 261 Mich. 50. See, also, *Basmajian* v. *City of Detroit,* 256 Mich. 539.

In the case at bar, no explanation or excuse was offered for the several years' delay in filing a demand, nor did the plaintiff object to the trial court's

refusal to waive the rule. It is established policy to protect the rights of infant litigants and such is the law in Michigan. But what rights has the infant lost in this case? No one complains that the trial was not a fair and impartial one. No one accuses the trial judge of bias or prejudice, nor could they, in the light of the learned trial judge's observation and application of the following quotation from Mr. Justice GRAVES to the tragedy herein presented:

"In considering the testimony in this case it might be well for the court and counsel to think of the statement of the Supreme Court in the case of *Marquette, Houghton & Ontonagon Railroad* v. *Marcott*, 41 Mich. 433, as a warning against viewing the testimony in an unwarranted light. The court said:

" 'There is something in a catastrophe of this nature and especially where the victim is a little child which at once stirs the heart and inflames the sympathies, and in the tumult of the feelings is very apt to cause a hasty inclination to consider the immediate apparent agency as in some way surely deserving chastisement for the dreadful event, and without any special reference to those conditions which in justice ought to decide the question of culpability.

" 'However generous and noble the natural qualities from whence this trait proceeds, it is the apparent duty of judges and juries to repress it and sedulously withstand its influences.

" 'The law commands them to rise above such tendencies and to inflexibly apply the principles of cold and evenhanded justice to the facts. The duty may be difficult, but the law is vigorous in its requisition of obedience, and it will withhold blame from the defendant unless it discovers there was fault so connected with the event as to have operated as the proximate cause of it.'

"Certainly the tragedy of this boy's life can appeal to none more forcibly than it does to this court. It is a pitiable situation, but this is neither a court of sympathy, nor a court of pity, but a court of law. It is apparent at the outset that no one will ever, or can ever definitely and surely know the cause of this boy's blindness. The cause lies hidden in obscurity and mystery, and the most that the court or any one else can do is to learn all it can as to the possible way in which this misfortune may have stricken this child."

Error to be reversible must be prejudicial. *Sweeney* v. *Adam Groth Co.*, 269 Mich. 436.

Plaintiff filed a petition for discovery under Court Rule No. 41 (1931) (now Court Rule No. 41 [1933]) and issued a subpœna *duces tecum*, requiring defendants Shurly, Gaines and Hewitt to appear before a notary public for examination on the 14th of February, 1933, at 1:30 p. m. Defendants immediately filed a motion to vacate the petition for discovery and order, and noticed it for hearing. On February 16, 1933, before trial was commenced and under the authority of *Gemsa* v. *Dorner*, 256 Mich. 195, the court granted the motion and quashed the petition for discovery, on the ground that the witnesses were then in court with the records desired by plaintiff and could be examined by counsel under proper supervision. Accordingly, both Dr. Shurly and Dr. Gaines, as well as Dr. Hewitt, were called for cross-examination by plaintiff's counsel. Court Rule No. 41 (1931) was adopted from the New York practice (see *Fisher* v. *Smith*, 259 Mich. 279, for cases construing the New York rule), and has been broadly construed in Michigan. See *Vincent* v. *Van Blooys*, 263 Mich. 312.

"Right to take the deposition can be tested by a motion to vacate the notice. The issue then is whether the reasons for the notice and the information sought disclose a *bona fide* need in framing an issue or preparing for trial." *Nestle* v. *Fleming*, 262 Mich. 417.

Does the notice in this case and the information sought disclose a good faith motive? We do not think so because the witnesses and documents required by plaintiff's demand were produced and the testimony of the witnesses was taken, the court being liberal in permitting the fullest cross-exami-

nation. No effort had been made to obtain this testimony prior to February 14, 1933; and while the taking of the testimony was noticed for that day at 1:30 o'clock in the afternoon, it was actually taken in the forenoon of February 16, 1933, less than two days later. It is not claimed, nor can it be claimed, that plaintiff was in any way prejudiced by taking the testimony on February 16th, instead of two days earlier; no surprise was claimed nor was any adjournment asked. On review, unless it appears that the party is prejudiced by an order which ought not to have been made, the case will not be reversed on that account alone. *Tropical Paint & Oil Co.* v. *Hall,* 225 Mich. 293.

The trial court said:

"Disposing of the first claim of the plaintiff it is the opinion of the court that this operation was in law an assault, being unauthorized by the parents of this child, and that if Dr. Shurly and his associates chose to assume that such consent had been given to the city physician, they adopted the assumption at their own risk, and if their assumption turned out to be erroneous, it affords them no protection."

Except in the very extreme cases, a surgeon has no legal right to operate upon a child without the consent of its parents or guardian. *Rishworth* v. *Moss* (Tex. Civ. App.), 191 S. W. 843; *Mohr* v. *Williams,* 95 Minn. 261 (104 N. W. 12, 1 L. R. A. [N. S.] 439, 111 Am. St. Rep. 462, 5 Ann. Cas. 303); *Browning* v. *Hoffman,* 90 W. Va. 568 (111 S. E. 492).

"It seems to be reasonably established that a physician is liable for operating upon a patient unless he obtains the consent of such patient, if competent, and, if not, of someone who, under the circumstances, would be legally authorized to give the requisite consent." *Rolater* v. *Strain,* 39 Okla. 572 (137 Pac. 96, 50 L. R. A. [N. S.] 880), cited in 21 R. C. L. p. 392.

See, also, *Franklyn* v. *Peabody,* 249 Mich. 363, for a discussion of assault during operation. For other cases where consent will be implied in an emergency, see *Pratt* v. *Davis,* 224 Ill. 300 (79 N. E. 562, 7 L. R. A. [N. S.] 609, 8 Ann. Cas. 197) ; *Schloendorff* v. *Society of New York Hospital,* 211 N. Y. 125 (105 N. E. 92, 52 L. R. A. [N. S.] 505, Ann. Cas. 1915C, 581). See, also, *Gillette* v. *Tucker,* 67 Ohio St. 106 (65 N. E. 865, 93 Am. St. Rep. 639, and note).

We have held that an emergency operation on a 15-year old boy is justified without the consent of the parents. *Luka* v. *Lowrie,* 171 Mich. 122 (41 L. R. A. [N. S.] 290). See, also, *Bakker* v. *Welsh,* 144 Mich. 632 (7 L. R. A. [N. S.] 612, 8 Ann. Cas. 195, 20 Am. Neg. Rep. 382).

The instant case is not one of emergency nor is it governed by the principles of the *Bakker Case,* *supra.* That case was governed by the circumstances disclosed on the record as to age and the presence of adult relatives. In both the *Bakker* and *Luka Cases* the court noticed closely that there was nothing in the record to indicate that the parents would have refused to give their consent to the operation if they had been present, while in the case at bar it plainly appears from the record that Tony's parents had repeatedly indicated that they did not want the boy's tonsils removed. In view of the child's age, the fact that neither of his parents were with him at the time of the operation, or came to the hospital with him, and yet giving all due weight to the memo from the city physician, we cannot allow consent to be implied in such situations. To do so would go far beyond the law as laid down in the authorities cited and examined.

We have referred to Dr. Parker's diagnosis and recommendation. The cause of the claimed inter-

cranial pressure, in spite of the testimony of five physicians, is still shrouded in sheerest conjecture, although all testified to its possible cause. The record also contains the testimony of these physicians as to possibilities of relationship between the unauthorized tonsillectomy and plaintiff's subsequent blindness. The various theories, which the witnesses discussed, may be summarized as:

1. Infection from the tonsils traveling along the olfactory nerve and penetrating the brain cavity with consequent injury to the optic nerve;

2. Infection passing into the blood stream and being carried into the brain;

3. Post-anginal sepsis in which the infection does not actually penetrate the blood stream, but is carried along with the blood stream into the brain;

4. A pus thickening, blocking the nares and resulting in an enforced infection into the brain cavity;

5. Brain tumor;

6. Brain abscess;

7. Pituitary disturbance;

8. Atrophy of the optic nerve resulting from the blow to plaintiff's forehead when he fell and struck his head against the bed during the night following the operation;

9. Hemorrhages following the tonsillectomy by which blood and infection were transmitted into the sphenoid sinuses, and which without actually penetrating the brain cavity, might result in (a) due to close proximity of optic nerve an inflammatory reaction pinching off nerve and producing blindness; (b) in reaction against infection, blood stream bringing increase of leucocytes, and the gathering or congregation of the leucocytes causing pressure or impingement on the optic nerve with consequent blindness;

10. Embolism—a small clot frequently following operation, hemorrhage, or traumatic injury, lodging

against optic nerve with consequent pressure resulting in blindness.

Under the testimony of all of the medical witnesses, the first seven of these theories were ruled out, because of absence of symptoms or manifestations in addition to blindness, which would necessarily have appeared. The witnesses agreed that infection penetrating the brain cavity would have been progressive and would have resulted in the death of the plaintiff prior to the trial of this cause; that tumor or pituitary disturbance would inevitably have been manifested in symptoms which did not appear in the plaintiff. As to the remaining theories, the witnesses were not in accord.

Dr. Feldman, a graduate of the medical school of the University of Michigan, served his internship at St. Mary's hospital, had been in practice less than a year at the time of the trial, and had performed only three tonsillectomies as a practicing physician. He testified that the regurgitation of blood with transmission of hemorrhage into the sphenoid sinuses, and consequent reaction affecting the optic nerves was a possible explanation of the boy's condition. He also testified on direct examination:

"*A.* Well, in my opinion, since the child's eyesight was perfect, prior to the operation, was able to see, able to get about, able to attend school, and be in all forms of activity, and then, in a few weeks or so after an operation, in my opinion there can be only one conclusion and that is, that the operation had something to do with that blindness."

Dr. Frank L. Ryerson testified that he graduated from the Detroit College of Medicine in 1911 and had specialized in eye, ear, nose and throat work, that he was familiar with tonsillectomy operations and had performed at least 3,000. He further testified that he saw the plaintiff while he was at the

Shurly Hospital on his second trip on October 18, 1927, and made an independent diagnosis as to the cause of his condition at that time, and said there was no connection between the tonsillectomy and the blindness.

Dr. Joseph C. Beck, designated by Dr. Ryerson as "probably the best authority in the United States on" ear, nose and throat, and president of the American Otological Association, testified that he had been engaged in practice since 1895, had specialized in ear, nose and throat work for 32 years, had lectured for many years on that subject at the University of Illinois and had in the course of his practice performed thousands of tonsillectomies. With reference to the possibility of an embolus locating in the iter so as to cause blockage and injury to the optic nerve, he testified that while he had never seen such a thing develop in his own practice, he could see where it might occur, even though the possibility was very remote, but because one has to theorize about it and it had never occurred in his own practice, it was therefore coincidental and not at all in connection with the tonsillectomy.

Dr. Claude B. Gaines, called as a witness under the statute for cross-examination, also testified as to absence of any relationship between the operation and the loss of vision.

The trial court held:

"The court has been asked to balance probabilities in this case, to assume on one hand the probability of this embolus having caused the blindness, and upon the other hand the improbability of it having caused the blindness. The scales are not even remotely balanced. Therefore, the court finds as a fact that there was no causal connection between the unauthorized operation on the boy's tonsils and the subsequent blindness with which he is now afflicted."

According to the testimony produced, medical science is unable to adequately explain the cause of the boy's blindness, and it was not satisfactorily proven to the trial court by a preponderance of the evidence that either the tonsillectomy or the blow caused the blindness. We will not lightly disturb the findings of a trial judge, *Common Council of Negaunee* v. *Muck,* 205 Mich. 382, and the determination of a trial judge sitting without a jury is as stated by Mr. Justice NORTH in *Dunnette* v. *Henry L. Doherty & Co.,* 252 Mich. 597, 602, "as binding upon us as a special verdict."

Dr. Feldman's testimony as to the theory of hemorrhages into the sphenoid sinuses and consequent reaction affecting the optic nerves did not disclose sufficient evidentiary facts upon which to base his opinion. In this regard Mr. Justice WIEST held in *Ford* v. *Nicol,* 261 Mich. 307:

"The testimony did not disclose evidentiary facts. The expert had but a theory that plaintiff was sterile because she did not become pregnant; that she did not become pregnant because of lack of ovulation; that lack of ovulation was because of shock to her nervous system. Probative evidence must be something more tangible than a mere pyramiding of theories. The witness gave no satisfactory data upon which to base his conjectures."

For cases where it has been held that we do not consider causes based on conjecture, probability or mere guess, see *Slater* v. *Federal Life Ins. Co.,* 262 Mich. 85; *Manning* v. *Railway Co.,* 105 Mich. 260; and *Knapp* v. *Railway Co.,* 114 Mich. 199. Mr. Justice WIEST also ruled in *Frye* v. *City of Detroit,* 256 Mich. 466:

"The court was of opinion that it was impossible to determine whether the injuries, causing death, were inflicted by the automobile or by the street car

and declined to let the jury guess or conjecture upon the subject. * * * It was necessary for plaintiff to submit proof, from which the jury could draw the reasonable inference that the death of plaintiff's decedent would not have occurred but for the negligence of defendant city. The plaintiff must go beyond showing that such might have been the case.''

The trial court held in this regard:

''What is the probability? It is an event which is more likely to happen than not. It is the thing which we ordinarily expect to flow from a given condition. Without the most grievous logical distortion, could any impartial person say that it was probable that such an embolus existed; that it existed in the particular part of this boy's body which has been indicated; that it was of sufficient size to cause the result which followed, and that if all these are answered in the affirmative, that the embolus was set in motion by the operation? The court cannot adopt this far-fetched conjecture. It scarcely reaches the dignity of speculation; it is the wildest kind of a guess, and more than that, it is composed of two wild guesses, one predicated upon the other. Certainly one's responsibility in damages is not to be predicated upon this sort of reasoning. I know of no rule which abrogates the necessity of proving a cause of action in a case like this.

''The burden in this case, as in all cases, is upon the plaintiff to establish what he claims by a preponderance of the evidence. Can we say that the fact that a most unusual, unique, and unexpected result follows a given act is proof that that result is the probable result—that it is more likely to happen than not? In the face of proof that in many thousands of cases, this result has not followed, and that in no case which has been brought to the attention of the court, except this one, has it ever followed— in the face of that proof, I repeat, can it be said that the result is probable? Only in the most remote degree can it be said to be even possible.''

The only evidence of injury was a contusion or swelling on the boy's head. No fractures resulted, no concussion followed, the skin was not broken. The meager testimony offered as to this cause has failed to prove that the fall caused the blindness.

The serious nature of the case presented has required an exhaustive search of the authorities, a minute examination of the testimony, and justifies, we hope, the length of this opinion. Our natural desire would be to afford relief to the stricken plaintiff, but we must follow the law as it should be applied to the testimony. We cannot disagree with the finding of the trial judge, and having discovered no reversible error the judgment must be affirmed.

It is so affirmed. Both sides having appealed, no costs will be allowed.

POTTER, C. J., and NELSON SHARPE, NORTH, FEAD, WIEST, BUTZEL, and EDWARD M. SHARPE, JJ., concurred.