210 N.J. Super. 548 (1986)
510 A.2d 136
IN THE MATTER OF GEORGE CLARK.
Superior Court of New Jersey, Chancery Division Camden County.
Decided April 7, 1986.
*549 Betty S. Adler for Cooper Hospital/University Medical Center (Archer and Greiner, attorneys).
John J. Mulderig, Guardian Ad Litem for George Clark (Brown and Connery, attorneys).
*550 TALBOTT, J.S.C.
This matter is before the court on an Order to Show Cause of Cooper Hospital/University Medical Center for a declaratory judgment as to the competency of George Clark and a determination as to whether a life-saving enterostomy operation should be ordered for a patient whose neurological and medical condition, while severe, has not reached the vegetative state. Significant to this determination is whether the standards and procedures set forth by the Supreme Court in In re Quinlan, 70 N.J. 10 (1976), and In re Conroy, 98 N.J. 321 (1985), are applicable in this situation.
George Clark is a 45-year-old white male who has been a patient at Camden County Health Services at Lakeland since October 1982. Clark was admitted to Cooper Hospital/University Medical Center (Cooper) on November 21, 1985. His admitting diagnosis was malnourishment and dehydration caused by his incapacity to eat a sufficient amount of food. Although he has partial paralysis and organic brain damage from a stroke suffered approximately four years ago, resulting in a very low cognitive level, Clark is not in a coma nor in a vegetative state. The circumstances of this case are unique in that, if the proposed operation is performed, Clark's medical problem connected with malnutrition would be resolved and he could live indefinitely since his other problems are not life-threatening, whereas without the operation Clark will most likely die of starvation and dehydration within a short period of time.
At a hearing on December 19, 1985, testimony was given by seven of Clark's twelve siblings, and by a number of physicians who examined him: Dr. McMahon, Clark's attending physician; Benjamin Wolfson, M.D., a psychiatrist; Allen C. Zechowy, M.D., a neurologist and a member of the Cooper staff; and Richard Spence, M.D. a cardiovascular surgeon, also a member of the Cooper staff and a member of the Optimal Care Committee. He testified on behalf of the Committee.
*551 The first issue is Clark's competency to consent to the proposed surgical enterostomy. The test for determining if a person is capable of consenting to medical treatment is whether the patient can reasonably understand the condition, the nature and effect of the proposed treatment, and the attendant risks of pursuing or not pursuing the treatment. In re Conroy, 98 N.J. 321, 382 (1985), citing In re Schiller, 148 N.J. Super. 168, 180-181 (Ch.Div. 1977).
Clark's attending physician at Cooper is Thomas McMahon, M.D., who is board certified in internal medicine. Dr. McMahon has seen Clark almost every day for a period of two months. He testified that, in his opinion, Clark cannot comprehend his own medical condition, nor the risks, alternatives and possible effect of proposed treatment plans. Dr. McMahon stated that it is difficult to say how much Clark understands because he cannot communicate to any significant degree. While he can sometimes mumble words or shake his head sufficiently to state simple needs, he is not competent to consent to or refuse surgery.
Dr. Wolfson, a psychiatrist engaged by the court appointed Guardian Ad Litem, John Mulderig, Esq., examined the patient on December 18, 1985. Dr. Wolfson agreed that Clark is not competent to make decisions on his own behalf or to care for himself. Dr. Wolfson stated that although Clark frequently closed his eyes and was lethargic during the doctor's examination, he was able to respond when spoken to. Clark could whisper "yes" and "no" appropriately at times, and could follow instructions to use other means of communicating, such as nodding or shaking his head, or blinking his eyes. Dr. Wolfson requested that Clark write, and although Clark was not physically able to write (his hand went off the page), he was able to attempt a purposeful response to Dr. Wolfson's request that he write. He was able to respond to one-step commands, and to make simple arithmetic calculations by showing numbers with his fingers. However, this activity was not consistent or sustained. At times, Clark appeared confused and could not *552 follow Dr. Wolfson's instructions. In response to Dr. Wolfson's question of whether he was happy, Clark nodded "yes." He was aware that he was in a hospital, although he did not know which hospital he was in. Dr. Wolfson diagnosed the patient as having limited intellect, being somewhat immature, and using passive-aggressive methods of behavior. In Dr. Wolfson's medical opinion, a greater effort should be made to feed George Clark by mouth. Finally, Dr. Wolfson testified that, in his opinion, Clark is not competent to consent to the medical procedure. When asked if he wanted surgery, Clark said "no," but Dr. Wolfson stated that it is unclear whether Clark understood the implications of foregoing the procedure.
Based on the testimony of Drs. McMahon and Wolfson, I find that Clark, although able to interact somewhat with his environment, is not competent to give informed consent to the proposed medical treatment or to govern his affairs in general. He is not competent to comprehend his medical condition, or to understand the nature and effect of the proposed enterostomy, nor the attendant risks of pursuing or not pursuing the treatment. I further find that the testimony is clear and convincing that Clark will not regain the capability of making the decision for himself. In re Grady, 85 N.J. 235, 265 (1981). It is therefore appropriate that a temporary guardian for the purpose of consenting to any medically necessary procedures be appointed by this court.
The second issue before the court is whether an enterostomy should be performed. Since November 25, 1985, Clark has been nourished by means of central intravenous lines which have a useful life of approximately one week. Dr. McMahon suggested the treatment plan for Clark, which includes performing an enterostomy: placing a permanent feeding tube into the stomach or jejunum. It is Dr. McMahon's opinion that, with the enterostomy, Clark could live for a long period, but without it he will probably die in a short time. Clark's family refused to consent to this operation.
*553 The procedure for determining whether life sustaining treatment should be provided to or withheld from incompetent patients was discussed in In re Quinlan, 70 N.J. 10 (1976) and In re Conroy, 98 N.J. 321 (1985). In Quinlan, the patient was a 21-year-old woman who was in a persistent vegetative state. Her father sought to be appointed guardian and sought the power of authorizing the discontinuance of extraordinary life support mechanisms. In Conroy, the patient was an 84-year-old nursing home patient who suffered from serious irreversible physical and mental impairments. Her nephew and guardian sought permission to remove a nasogastric feeding tube, which was the primary means of nourishing Claire Conroy.
There are a number of similarities in the patients' situations, but Clark's condition does not place him squarely within either the Quinlan or the Conroy categories. Unlike either Ms. Quinlan or Ms. Conroy, Clark is not in a coma nor in a vegetative state. Unlike Karen Quinlan, who had no physical problems other than her comatose condition, Clark has medical problems unrelated to his stroke, including gastric problems, high blood pressure, partial paralysis and incontinency. But his medical condition is not quite as severe as that of Ms. Conroy, which was described by the Supreme Court:
At the time of trial, Ms. Conroy was no longer ambulatory and was confined to bed, unable to move from a semi-fetal position. She suffered from arteriosclerotic heart disease, hypertension, and diabetes mellitus; her left leg was gangrenous to her knee; she had several necrotic decubitus ulcers (bed sores) on her left foot, leg and hip; an eye problem required irrigation; she had a urinary catheter in place and could not control her bowels; she could not speak; and her ability to swallow was very limited. On the other hand, she interacted with her environment in some limited ways: she could move her head, neck, hands and arms to a minor extent; she was able to scratch herself, and had pulled at her bandages, tube, and catheter; she moaned occasionally when moved or fed through the tube, or when her bandages were changed; her eyes sometimes followed individuals in the room; her facial expressions were different when she was awake from when she was asleep; and she smiled on occasion when her hair was combed, or when she received a comforting rub. [Conroy, supra, 98 N.J. at 337.]
Despite some differences in the patients' conditions, the standards for substitute decision-making articulated in Quinlan *554 and Conroy are applicable in this case. Clark, like Quinlan and Conroy, is not competent to make treatment decisions on his own behalf. In Quinlan, the Supreme Court specifically stated that:
[t]he declaratory relief we here award is not intended to imply that the principles enunciated in this case might not be applicable in divers other types of terminal medical situations ... not necessarily involving the hopeless loss of cognitive or sapient life.
Quinlan, supra, 70 N.J. at 54, n. 10.
In Conroy, the Court stated that it had not attempted to set forth guidelines for decision-making with respect to life-sustaining treatment in a variety of other situations not before the Court. The Court cited as examples of such other situations "That of the severely deformed newborn, of the never-competent adult suffering from a painful and debilitating illness, and of the mentally alert quadriplegic who has given up on life." Conroy, supra, 98 N.J. at 387. These other situations differ significantly from that of Claire Conroy: deformed newborns and never-competent adults have never expressed their subjective attitudes towards medical treatment, while mentally alert quadriplegics could probably make informed decisions concerning medical treatment. On the other hand, Clark's situation is comparable to that of Claire Conroy. It is therefore appropriate to decide this case under the Quinlan and Conroy standards.
In both Quinlan and Conroy, the New Jersey Supreme Court stated that, if competent to make medical decisions on her or his own behalf, a patient could choose to refuse the proposed treatment. In Quinlan, the Court stated:
We have no doubt ... that if Karen were herself miraculously lucid for an interval (not altering the existing prognosis of the condition to which she would soon return) and perceptive of her irreversible condition, she could effectively decide upon discontinuance of the life-support apparatus, even if it meant the prospect of natural death.
Quinlan, supra, 70 N.J. at 39. Similarly, in Conroy, the Court reviewed the case law and concluded: "[W]e have no doubt that Ms. Conroy, if competent to make the decision and if resolute in *555 her determination, could have chosen to have her nasogastric tube withdrawn." Conroy, supra, 98 N.J. at 355. The Court further said that, if a patient is incompetent and "unable to exercise their own right to accept or refuse medical treatment," substitute decision makers who attempt to exercise that right on their behalf "must seek to respect simultaneously both aspects of the patient's right to self-determination  The right to live, and the right, in some cases, to die of natural causes without medical intervention." Conroy, supra, 98 N.J. at 356.
Quinlan and Conroy provide somewhat different standards and procedures for substitute decision making. In Quinlan, the emphasis was placed on the patient's prognosis, and the concurrence of family, guardian, attending physician and hospital Ethics Committee regarding the prognosis and the desirability of withdrawing the life support system. Quinlan, supra, 70 N.J. at 55. In Conroy, although the Court took into account the patient's prognosis, the primary focus was on exercising the patient's right to self determination by making a decision that is as close as possible to the one the patient would have made. To that end, the Court articulated three standards for deciding whether to accept or refuse medical treatment on behalf of an incompetent patient. The first standard is a subjective one: "not what a reasonable person would have chosen to do under the circumstances but what the particular patient would have done if able to choose for himself." Conroy, supra, 98 N.J. at 361. This evidence is to be considered along with evidence regarding the patient's condition, treatment and prognosis. The subjective test is to be applied when there is reliable evidence indicating what the incompetent patient would have preferred. The Court articulated two "best interest" standards to be applied in the absence of convincing evidence: a "limited-objective test" and a "pure objective test." The limited-objective test is to be applied when there is some evidence of what the patient would have wanted but that evidence is not conclusive, so that a decision cannot be made under the subjective test. In such a case, the subjective evidence is considered *556 along with medical evidence, which indicates whether it is in the patient's best interests to provide or to withhold treatment. Finally, the pure objective test is to be applied where there is no reliable evidence of what the patient would have wanted. In such a case only the medical evidence is considered.
In Quinlan and Conroy, the Supreme Court outlined procedures to be followed by hospitals and other institutions deciding whether a life support system should be provided or withdrawn. Both cases required the concurrence of the guardian, family, treating physicians and, in Conroy, the ombudsman and two independent physicians. See Quinlan, supra, 70 N.J. at 55; Conroy, supra, 98 N.J. at 383-85. Other than for the appointment of a guardian for incompetent patients, resorting to a court is not necessary if these procedures can be applied. See Conroy, supra, 98 N.J. at 385.
It was necessary to resort to the court in this case because the required concurrence is not present. Seven of Clark's siblings testified at the December 19, 1985 hearing. In addition, each of the testifying physicians gave an opinion regarding whether the enterostomy should be performed and Clark's case was reviewed by Cooper's Optimal Care Committee.
Of the seven siblings who testified at the hearing in this matter, all but one, Mary Pfeiffer, testified to their refusal to consent to performance of the enterostomy. Their refusal is essentially based upon their evaluation of Clark's present quality of life and perceived level of suffering, and the fact that it is unlikely that he would make any neurological recovery. Mary Pfeiffer testified that she would neither consent nor refuse to consent to the surgery and would rather have the Court make the determination. She does prefer that her brother be fed naturally. Each sibling who has refused to consent has done so with the understanding that without the enterostomy, Clark would likely die in a very short time, but that with the enterostomy, he could live indefinitely.
*557 The opinions of the physicians who have treated and consulted concerning Clark vary with regard to whether the enterostomy should be performed in order to provide long-term nourishment to him. Dr. McMahon believes that the enterostomy should not be performed since, in his belief, tube feeding is an extraordinary means by which to keep alive a patient who has no prognosis of a functional or neurological recovery and who has a poor "quality of life."
Dr. Zechowy, a neurologist, examined the patient on two occasions, the most recent being on December 17, 1985. Dr. Zechowy testified that Clark's neurological condition has an undetermined diagnosis and prognosis. He said that the patient's variable presentation is consistent with degenerative diseases: the patient may present different levels of cognitive functioning from day to day. Dr. Zechowy stated that the first time he examined Clark the patient was lying quietly in a fetal position. During his second visit, Clark was more alert. Clark did not attempt any spontaneous communication or try to make social responses. He could not communicate clearly, and his answers to questions were unreliable due to their inconsistency. Although Clark could respond to simple commands like "open mouth" and "close mouth," he did not respond to "show hand" or to anything other than one-step instructions. He also offered the opinion that his neurological problems may be related to Alzheimer's disease based upon marked atrophy appearing on a recent CAT scan. Dr. Zechowy further testified that although Clark's cognitive level is low, he is not neurologically in a vegetative state.
From Dr. Zechowy's medical perspective, the patient should be nourished since his neurological condition and prognosis are undiagnosed and there is no evidence that his demise is imminent or that he is experiencing pain or discomfort. In Dr. Zechowy's medical judgment, providing nourishment by placement of a permanent feeding tube into the stomach is not an extraordinary means of treatment.
*558 Dr. Richard Spence, a member of the Optimal Care Committee at Cooper (a committee of physicians which gives advice regarding further therapy or choice of therapy), saw Clark on December 4th and 18th of 1985. During the first visit, Clark was asleep. On the second visit, Dr. Spence observed a presentation similar to that observed by the other physicians. On that occasion, when Clark was awakened by the nurse for a feeding, he responded and was able to eat ice cream. Clark could shake his head "yes" and "no," but could not carry on a conversation. Dr. Spence testified that while Clark has a low level of cognitive function, he was awake, not in apparent pain, not on life support systems, and not about to die. He recommended that the enterostomy be performed so that Clark would not starve to death and would, instead, be provided proper nourishment. Cooper itself takes no position with regard to whether the enterostomy should or should not be performed.
It is clear that there is not a concurrence of the family members, the attending and independent physicians and the Cooper Optimal Care Committee with regard to whether the enterostomy should be performed. Quinlan requires a concurrence among the above parties that "There is no reasonable possibility of [the patient] ever emerging from her present comatose condition to a cognitive, sapient state" before a life support system may be withdrawn. Quinlan, supra, 70 N.J. at 54. Conroy requires a concurrence among the parties regarding whether the life-sustaining medical system should be provided or withdrawn. In this case, there is not a complete concurrence among the family members, the attending physicians and the hospital Ethics Committee. Therefore, the Quinlan and Conroy procedures could not be followed by the hospital alone and it became necessary to resort to the court. The court cannot apply the Quinlan standard because Clark is not in a comatose condition. A determination of whether or not the enterostomy should be performed must be made by the court applying one of the three Conroy standards.
*559 The first Conroy standard is the subjective test, which consists of two components. One component is a determination of what the incompetent patient would have wanted if she or he were able to make her or his own decision. In articulating this test, the Court expressly overruled that portion of the Quinlan decision which disregarded statements Karen Ann Quinlan made to friends regarding her feelings on artificial means of life support. Quinlan, supra, 70 N.J. at 41; Conroy, supra, 98 N.J. at 362. The Supreme Court indicated that various types of evidence could be appropriate to determine what the incompetent patient would have wanted.
The patient may have expressed, in one or more ways, an intent not to have life-sustaining medical intervention. Such an intent might be embodied in a written document, or "living will," stating the person's desire not to have certain types of life-sustaining treatment administered under certain circumstances. It might also be evidenced in an oral directive that the patient gave to a family member, friend, or health care provider. It might consist of a durable power of attorney or appointment of a proxy authorizing a particular person to make the decisions on the patient's behalf if he is no longer capable of making them for himself ... It might take the form of reactions that the patient voiced regarding medical treatment administered to others. See, e.g. [In re] Storar, supra, 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266 [1981] (withdrawal of respirator was justified as an effectuation of patient's stated wishes when patient, as member of Catholic religious order, had stated more than once in formal discussions concerning the moral implications of the Quinlan case, most recently two months before he suffered cardiac arrest that left him in an irreversible coma, that he would not want extraordinary means used to keep him alive under similar circumstances). It might also be deduced from a person's religious beliefs and the tenets of that religion, id. at 387, 420 N.E.2d at 72, 438 N.Y.S.2d at 274, or from the patient's prior decisions about his own medical care. Of course, dealing with the matter in advance in some sort of thoughtful and explicit way is best for all concerned. [Conroy, supra, 98 N.J. at 361-62 (footnotes omitted).]
The Conroy opinion cautioned, however, that although all evidence tending to show the incompetent patient's wishes should be considered by the substitute decision-maker, or by a court, the probative value of such evidence might vary depending on its remoteness, consistency, "the thoughtfulness of the prior statement or action," "the maturity of the person at the time of the statements or acts," as well as the "specificity" of the prior statements. Conroy, supra, 98 N.J. at 362-63.
*560 The second component of the subjective test is medical evidence bearing on the patient's condition, treatment and prognosis:
The medical evidence must establish that the patient fits within the Claire Conroy pattern: an elderly, incompetent nursing-home resident with severe and permanent mental and physical impairments and a life expectancy of approximately one year or less. In addition, since the goal is to effectuate the patient's right of informed consent, the surrogate decision-maker must have at least as much medical information upon which to base his decision about what the patient would have chosen as one would expect a competent patient to have before consenting to or rejecting treatment. [Conroy, supra, 98 N.J. at 363.]
In this case, there is little subjective evidence as to his wishes. Clark has made no living will, nor signed a power of attorney authorizing another person to make decisions on his behalf. There was no evidence that Clark ever orally stated his desire regarding treatment to any family member, friend or healthcare provider.
Clark's next of kin are twelve siblings all of legal age. He was married for ten years, but has been divorced for several years. Seven of his siblings testified at the hearing in this matter. Clark's other siblings who did not appear in court were unable to attend the hearing due to their work schedules or indicated to Robert Clark, one of George's brothers, that they would abide by the family's decision.
These brothers and sisters were able to provide some limited indication of what Clark would prefer. Clark received schooling through the fourth grade and held several jobs but never held any steady jobs because of sickness and various medical conditions that he experienced since he was a child. Clark was raised a Methodist, became Catholic when he was married, and when divorced returned to the Methodist church. There was no clear indication of how Clark's religious beliefs would affect his attitude towards artificial life support systems. The only statements the family recalled were statements regarding Clark's lack of belief in God due to his medical condition. Robert Clark testified that, while George was a patient at Lakeland Hospital, he noticed a change in his brother's attitude towards God: *561 George was "for God" before, but after he suffered the stroke, he felt that God had let him down. George refused to go to the Chapel and stated he did not believe in God anymore. Ms. Lillie Gogolan, one of Clark's sisters, also testified that George refused to go to the Chapel while at Lakeland Hospital because he felt that God had let him down.
Clark had not, to his family's knowledge, ever made a statement regarding treatment being administered to others. As far as comments regarding his own condition, Ms. Joanne Yorukanis and Ms. Lillie Gogolan related that, when one of their sisters died five years ago, George said "it should have been me." Ms. Gogolan pointed out that this sister had died suddenly, while George has always been sick. Clark's siblings stated that over the course of his life, George has had several surgical procedures and has never refused medical treatment. Robert Clark stated that George had strong will power and tried to make the best of his situation.
I find that there is no trustworthy evidence of what George Clark would have chosen for himself with regard to the performance of the enterostomy. The statement Clark made at his sister's funeral is not sufficiently specific and does not seem to have been made thoughtfully. The remark could be interpreted in different ways, and does not necessarily indicate that Clark does not wish to live. Finally, the statement is remote: it was made five years ago, prior to Clark's stroke, when his medical condition was very different. The statement cannot be used to assure what Clark would have wanted under the present circumstances.
The subjective test's second component is medical evidence bearing on the patient's condition, treatment and prognosis. Clark's neurological condition is discussed above. Clark's medical condition is as follows: he has a history of gastric resection, seizures, hypertension, and high blood pressure. As a result of his stroke, he has organic brain damage, right sided paralysis and weakness in the left leg. Clark is incontinent of bowel and *562 bladder. He is bedridden but can be placed in a wheelchair. He is able to chew and swallow to a certain extent but is not able to receive a sufficient quantity of food by mouth feeding to receive enough nourishment to survive. Efforts to feed Clark by mouth are vigorous, but Dr. McMahon reports that the patient often spits food out. Dr. McMahon believes that the swallowing problem is related to Clark's brain damage, but it is unclear why the patient does not swallow, since a Barium swallow test showed no blockage. Dr. Wolfson believes that the inability to swallow has a psychological basis, since the test was normal and Clark is able to eat ice cream and to drink fluids without difficulty. Dr. Wolfson stated that the refusal to eat is a symptom of Clark's passive-aggressive personality, and that if Clark received greater attention and warmth, and gentle efforts were made to feed him, he might respond by eating larger amounts although it is unclear whether this amount would be sufficient for him to survive. Clark's siblings testified that he liked "junk food." He did not like the food given to him at Lakeland Hospital because the items served were "not his goodies."
Whatever the causes of his inability to eat a sufficient amount of food, Clark is currently suffering from severe malnourishment. On November 25, 1985, a central intravenous line, and specifically, a right subclavian catheter was placed into Clark's chest by which he was supplied with nourishment. When the subclavian catheter began to become infected, it was removed and a second subclavian catheter was placed into the left side of Clark's chest. Thereafter, when that catheter began to become infected, a third central line, an internal jugular puncture, was placed into the left side of Clark's throat and remained in place at the time of the hearing on the Order to Show Cause on December 19, 1985.
In the medical opinion of Dr. McMahon, subclavian catheters and other central lines are not appropriate long-term methods by which to provide Clark proper nourishment since they pose pain and significant risks for the patient, including the development *563 of pneumothorax (air around lung) or an infection, and bleeding. Clark has developed complications from the central line including a pneumothorax which resolved itself and a pleural collection infection which is being treated by antibiotics. The central lines must be continuously replaced because they become either infected, clogged or worn out. They have a useful life of approximately one week and are painful to the patient each time they are inserted.
The proposed enterostomy is a low risk procedure, the risks being primarily those associated with surgery in general. The immediate post-operative discomforts of the enterostomy would last for approximately 24 to 28 hours and could be alleviated through the use of pain medications. Total post-operative discomforts should not last more than ten days.
If the enterostomy is performed, Clark will not experience any long-term pain or discomfort from the procedure or from his other conditions. He would have a life expectancy of indefinite duration and could return to Lakeland Hospital. Without the enterostomy or a subclavian catheter, Clark will likely die within a few days to a week as a result of starvation and dehydration, but would likely suffer only minimal pain. Other alternative treatment options, including long-term parenteral hyperalimentation, insertion of a naso-gastric tube, intravenous feeding, and subcutaneous or intramuscular hydration, have been explored by Dr. McMahon and, in his medical opinion, are inappropriate options.
Clark does not presently appear to be in any significant degree of pain nor does he have pains of any constancy or duration. He is occasionally and infrequently given a major tranquilizer, Halidol, when the nursing staff believes that he may be in some pain. There is no evidence of humiliation in George Clark's present treatment. He is, however, fully dependent upon the care of others in all of his life functionings. In conclusion, the patient's prognosis for functional recovery seems to be the same with or without the enterostomy. I find *564 that it is inappropriate to apply the subjective test in this case: "in the absence of adequate proof of the patient's wishes, it is naive to pretend that the right to self-determination serves as the basis for substituted decision-making." Conroy, supra, 98 N.J. at 364. Under these circumstances, it is more appropriate to apply one of the two "best interest" tests.
Under the limited-objective test two criteria must be met. First, there must be some trustworthy evidence "that the patient would have refused the treatment." Conroy, supra, 98 N.J. at 365. Second, the decision-maker must be satisfied that "the burdens of the patient's continued life with the treatment outweigh the benefits of that life for him." Id. In other words, where the evidence of what the patient would have wanted is not conclusive, the decision-maker must compare the burdens of the patient's life with the treatment to the benefits the patient derives from that life:
By this we mean that the patient is suffering, and will continue to suffer throughout the expected duration of his life, unavoidable pain, and that the net burdens of his prolonged life (the pain and suffering of his life with the treatment less the amount and duration of pain that the patient would likely experience if the treatment were withdrawn) markedly outweigh any physical pleasure, emotional enjoyment, or intellectual satisfaction that the patient may still be able to derive from life. This limited-objective standard permits the termination of treatment for a patient who had not unequivocally expressed his desires before becoming incompetent, when it is clear that the treatment in question would merely prolong the patient's suffering. [Id.; emphasis supplied.]
As discussed above, in this case there is no trustworthy evidence that the patient would have refused the treatment. It is therefore more appropriate to decide this case under the pure objective test.
This test is to be used when there is no trustworthy evidence, or no evidence at all, of what the patient would have wanted under the circumstances. A determination of whether certain treatment should be provided or withheld would then depend strictly on a weighing of the burdens of life with the treatment versus the benefits of that life to the patient:

*565 Under that test, as under the limited-objective test, the net burdens of the patient's life with the treatment should clearly and markedly outweigh the benefits that the patient derives from life. Further, the recurring, unavoidable and severe pain of the patient's life with the treatment should be such that the effect of administering life-sustaining treatment would be inhumane. [Conroy, supra, 98 N.J. at 366.]
As discussed above, there is no evidence that Clark is presently suffering pain which is recurring, unavoidable or severe. Dr. McMahon testified that Clark is not frequently in pain. Sometimes Clark is agitated and the nurses request the doctor to prescribe a sedative. At other times, the patient grimaces and appears to be in pain, but Dr. McMahon stated that those grimaces may be caused by a psychic disturbance. Dr. Wolfson testified that the patient did not seem to be in pain when he was examined. Dr. Zechowy and Dr. Spence also agreed that there was no evidence of pain or discomfort. Dr. Spence stated that the enterostomy would prolong the patient's life, not his suffering, because Clark is not suffering. In addition, the enterostomy itself is not likely to cause any pain other than normal post-operative discomfort.
It is clear that Clark derives some benefits from life. He is able to interact with his environment and to purposefully attempt to communicate. In response to Dr. Wolfson's question of whether he was happy, Clark stated "Yes." He also answered "Yes" on two separate occasions when asked if he was hungry and if he wanted food. It is clear that Clark feels hunger and thirst. Further, Dr. Spence observed that Clark seemed to enjoy eating ice cream during the doctor's visit. Combined with Clark's past history of enjoying "junk food," and the fact that his inability to swallow is more likely related to personality traits than to physical causes, Clark's enjoyment of ice cream suggests that he derives pleasure from tasting certain types of food. Finally, although Clark's cognitive level is low, he seems to derive some emotional and intellectual pleasure from life.
In Conroy, supra, 98 N.J. at 369, the Supreme Court emphasized that the primary focus of whether certain life-sustaining *566 treatment should be provided or withdrawn "should be the patient's desires and experience of pain and enjoyment  not the type of treatment involved." The Court rejected the distinction that some courts and commentators have made between the termination of artificial means of nourishment and the termination of other forms of artificial life support. The Court held that despite the fact that "feeding has an emotional significance" and that "it is hard to shed the `emotional symbolism' of food," there is no distinction between mechanical artificial feeding methods and other life support measures:
[A]rtificial feedings such as nasogastric tubes, gastrostomies, and intravenous infusions are significantly different from bottle-feeding or spoonfeeding  they are medical procedures with inherent risks and possible side effects, instituted by skilled health-care providers to compensate for impaired physical functioning. Analytically, artificial feeding by means of a nasogastric tube or intravenous infusion can be seen as equivalent to artificial breathing by means of a respirator. Both prolong life through mechanical means when the body is no longer able to perform a vital bodily function on its own. [Conroy, supra, 98 N.J. at 373 (citation omitted).]
The Court also pointed out that means of ensuring nutrition and hydration are not free from risks and burdens, and that in some cases dehydration may not be painful to the patient (i.e., where a patient is unable to sense hunger and thirst). Id. The Court concluded that the withdrawal of artificial feeding methods would be permissible if there were proof to satisfy the subjective, limited-objective or pure objective test. Conroy, supra, 98 N.J. at 374.
I find that of the three Conroy tests the subjective and limited-objective tests are not applicable in this case because of lack of subjective evidence. Applying the pure-objective test, I find that the net burdens of Clark's life with the enterostomy do not markedly outweigh the benefits that he derives from life. Administering this type of treatment is not inhumane in this case, since it would not cause or prolong suffering for Clark. It is therefore in Clark's best interests to undergo the enterostomy procedure.
*567 In accordance with these findings, an order was entered on December 20, 1985, providing:
A. George Clark is hereby declared incompetent to give informed consent to the medical procedure described herein and for the purpose of governing his affairs in general.
B. John J. Mulderig, Esq. is hereby appointed as temporary Guardian of George Clark without bond for the limited purpose herein stated and is directed to consent on behalf of the said George Clark to the performance of an enterostomy and such other procedures as are medically necessary for the performance of the enterostomy.
C. Robert Clark, brother of George Clark, is hereby appointed as General Guardian for George Clark to handle and govern his affairs beyond the consent to the above named surgery.
D. Telephonic notice of this final judgment shall be provided to all siblings of George Clark, the Guardian Ad Litem, and the attending physician, Thomas McMahon, M.D., by 5:00 p.m. on December 20, 1985 or as soon thereafter as they may be contacted.
E. Any application for a stay from this final judgment shall be made no later than 9:00 a.m. on December 23, 1985 and prior notice of said application shall be given to all parties.
The enterostomy was performed on December 24, 1985. Mr. Clark remained at Cooper Hospital due to a pleural collection caused by the subclavian catheter which was used to nourish him. This pleural collection was treated with antibiotics until the fluid was completely cleared. Mr. Clark was discharged from Cooper Hospital on January 13, 1986, and is currently at Lakeland Hospital.