PEOPLE *v.* MONDICH.

1. CRIMINAL LAW — MURDER — EVIDENCE—CORPUS DELICTI — CONFESSIONS.

In a prosecution for murder, where the finding of a human skeleton which competent medical testimony tended to prove evidenced death by criminal agency, the *corpus delicti* was sufficiently established to warrant the admission of statements by defendant in the nature of an extrajudicial confession which led to the making of the search by which the skeleton was discovered, since evidence of the *corpus delicti* is admissible at any time, notwithstanding it tends to connect the accused with the commission of the crime charged.[1]

2. HOMICIDE—MURDER—SELF-DEFENSE—QUESTION FOR JURY.

In a prosecution for murder, whether defendant, who had been living in meretricious relations with defendant, killed him in self-defense after threats and assaults upon her, *held*, under the evidence, a question of fact properly submitted to the jury.[2]

Error to recorder's court of Detroit; Stein (Christopher E.), J. Submitted April 15, 1926. (Docket No. 137.) Decided April 30, 1926.

Euphemia Mondich was convicted of murder in the first degree, and sentenced to imprisonment for life in the Detroit house of correction. Affirmed.

*Willard & Czarnecki,* for appellant.

*Andrew B. Dougherty,* Attorney General, *Robert M. Toms,* Prosecuting Attorney, and *Ward Culver,* Assistant Prosecuting Attorney, for the people.

STEERE, J. In December, 1924, defendant was

---

[1]Criminal Law, 16 C. J. § 1579; [2]Homicide, 30 C. J. § 580.
On proof of *corpus delicti* in homicide, see note in 68 L. R. A. pp. 34, 35, 46, 57, 73, 75-78; 7 L. R. A. (N. S.) 181.

tried, convicted and sentenced for life to the Detroit house of correction, under an information filed in the recorder's court of Detroit charging her with having, in the city of Detroit, Wayne county, killed and murdered one John Udurovich, on or about September 20, 1921.    On the trial defendant took the stand as a witness in her own behalf, and testified to the circumstances of her disposing of Udurovich on or about the time charged, her defense on the facts being that she acted in self-defense and the killing was justified.

The legal defense and ground for reversal urged in her behalf is failure by the prosecution to make competent initial proof of the *corpus delicti*, that contention being interrogatively propounded in her counsel's brief as follows:

"Was the *corpus delicti* proven when the confessions of the defendant were admitted over objection, and if not proven, was error committed?"

In the order of proof the prosecution first called as a witness William Sigsby, a foreman for the Detroit Seamless Steel Tube Company, who in 1921 owned a house and lot known as 17687 Dryer street, located on a scantily developed subdivision in the northerly outskirts of Detroit, and the only house on that side of the street in the block.    He identified defendant as the woman who, with her claimed husband, leased that place from him in September, 1921, under the name of Mr. and Mrs. John Udurovich.    They rented it for an indefinite period and paid two weeks' rent. While they occupied the place he had some plumbing done in the house, and was there to look after it.    He then again met his tenants.    He had conversed with Udurovich when he met him and was able to describe his appearance.    He also identified a photograph of him.    He knew they occupied the house for a week or more between September 10th and 25th, but they gave him no notice of quitting, and he first learned

they were gone when some one in that neighborhood, who wanted to rent the cottage, called him up and told him they had seen the furniture removed and the place appeared to be vacant. A Polish woman who knew defendant testified that the latter lived there with Udurovich for a week or more during September, 1921. There is no evidence any one saw them leave the place ' or Udurovich alive after that time. A woman of his nationality who knew him told of meeting him at various times before, but not since then.

The prosecution next called Dr. A. L. French, chief medical examiner of Wayne county, who qualified as an expert with years of experience in autopsies and *post mortem* examinations. He identified the bones of a human skeleton as having received them for examination from Lieutenant Collins, a detective of the Detroit police force. From his study of those bones, he testified to, and demonstrated with them, four punctures through the skull, caused, in his opinion, by two bullets, the marks of entrance and exit showing they were fired from the front, one entering below the right eye and the other at the left side of the chin. He was unable, from the condition of those wounds in the skull, to find any indication whether the subject was alive or dead when the punctures were made. He also found and pointed out a round, penetrating puncture or bullet hole through the right fifth adult rib, showing by the burr on the outside, or front, of the rib that it came from the rear, and showed a stain of blood infusion in the fiber of the rib, indicating, as he testified, that the subject was alive when that puncture was made, since no extravasation of blood causing such stain would take place after death. He also testified that a bullet fired into the back of a human being and taking the course indicated by the mark on the rib would pass through the right lobe of the liver, causing a hemorrhage which would result

in death.   Of the decomposition of a dead body, he testified it would be more rapid when buried near the surface of the ground, and faster in sand than clay.

This skeleton was found by Lieutenant Detective Collins and Sergeant Detective Wencel of the Detroit police, on September 8, 1924, buried near the surface in damp, sandy ground under the front porch of the house on Dwyer street in which defendant lived with Udurovich during a portion of September, 1921.   The skeleton, a bullet, and some buttons were all they found remaining in condition to identify.   It appeared they were led to make this search by information obtained from defendant.

Counsel for defendant urge prejudicial error on admission of testimony at that stage of the evidence as to what guiding information she gave the officers when the search was undertaken, on the ground that it was in its nature an extrajudicial confession of the defendant, by which alone the *corpus delicti* cannot be established, and without which it had not been shown. In support of this, counsel invoke the general rule that proof of the *corpus delicti,* or death of a human being and its cause, must be completed before any proof of confession, malice, etc., can be made, citing *People* v. *Hall,* 48 Mich. 482 (42 Am. Rep. 477), and other cases tending to sustain that rule.

*Corpus delicti* is defined as

"The body, substance or foundation of an offense. The substantial and fundamental fact of its having been committed."   Burrill's Law Dictionary.

"The body of a crime.   *   *   *   In a derivative sense, the substance or foundation of a crime; the substantial fact that a crime has been committed." Black's Law Dictionary (2d Ed.).

"In cases of felonious homicide, the *corpus delicti* consists of two fundamental and necessary facts: First, the death; and secondly, the existence of

234—Mich.—38.

criminal agency as its cause." Bouvier's Law Dictionary.

Here, irrespective of how or why the search was made, we have direct proof of the fact of death by the finding of a buried skeleton of a human being, with proof of where it was found, the condition in which it was found, and expert testimony of its condition showing a mortal wound inflicted before death, indicating a criminal agency as the cause of death. Those found facts testified to by eyewitnesses are original, substantive evidence of a *corpus delicti* in no sense contingent on extrajudicial confession or any other hearsay evidence. Her confession, or story told to the prosecuting attorney after her arrest and verified by the stenographer who took it down and transcribed it, was admitted in evidence after such proof of finding the remains.

Conceding the bones found furnished in themselves no evidence of the identity of the person whose remains they represented, that the place of finding and surrounding circumstances shown also failed to furnish adequate inference of identification to carry that question to the jury, and even that identity of the deceased person was essential to showing the *corpus delicti,* as is apparently contended, it has been said in a somewhat analogous case that:

"Where items of evidence tend not only to prove the *corpus delicti,* but tend to connect the defendant with the commission of the crime, they are admissible at any time." *People* v. *Kimbrough,* 193 Mich. 330.

In *People* v. *Jackzo,* 206 Mich. 183, where the rule contended for here was pronounced a wise one, which should be observed, it is said:

"That there are exceptions where the same set of facts, in cases of circumstantial evidence, tend to connect the defendant with the commission of the crime, and also at the same time to prove the *corpus delicti*

has been held, and the rule has been somewhat relaxed in such cases."

Defendant's so-called confessions are not claimed to have been obtained by any threats, promises, or other improper inducement. She admittedly told her story to the officers voluntarily, before and after her arrest, and repeated it at her trial as a witness in her own behalf. She did not admit or confess that she was guilty of any crime. Her attitude and claim in court and out was that she killed Udurovich in self-defense and was therefore justified in doing what she did. That issue was carefully submitted to the jury under full and correct instructions on the law of self-defense.

Defendant was a woman of mature years and varied experiences, and not a stranger to court proceedings. She was born, raised and first married in Austria, was divorced from her first two husbands, claimed her third was killed by Udurovich, with whom she afterwards lived in meretricious relations, and was married to a fourth husband some time before her trial. She first came to America in 1916, going to Winnipeg and from there drifted into Duluth, from where she was furnished free transportation to the land of her nativity under the Federal deportation act. She soon returned to America, going first to Toronto and from there to Detroit which has since been her abiding place. Her sordid story on the witness stand of her life with Udurovich and his claimed abuses of her, terminating in threats and assaults which compelled her to shoot him in self-defense, was for the jury. She testified that he had assaulted her, got his revolver and threatened to kill her unless she promised to marry him, get some more furniture and continue living with him. In fear he would carry out his threat in case of refusal she so promised. He then put his revolver under a pillow in the bed room, returned and sat down in the kitchen smoking cigarettes,

when she went and took the revolver from under the pillow and shot him in the eye before he could get to her.    Of what followed she said:

"Then after that he wants to run away.    Yes, he would open the window and get out.    He started for the window and then I shot him the second time in the back.    He fall down.    I shot him again over here (indicating) under the chin.  *  *  *  He fall down, he don't do me nothing, he can't do me nothing.    I put the gun under his chin and shoot.    After he was dead it was night."  *  *  *

She then related how she first carried his body to the cellar, and later dug a grave in the soft sand under the porch of the house where she dragged his body and buried it.    In connection with this account of that tragedy runs her protest that she acted in self-defense, in deadly fear of him, believing that if she did not do what she did to him he would kill her, as he had then and often before declared he would.    Her claim of self-defense was made strictly an issue of fact for the jury to decide under the law upon that subject, as fully explained in the court's charge.

The case will stand affirmed.

BIRD, C. J., and SHARPE, SNOW, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.