210 N.J. Super. 527 (1986)
510 A.2d 125
IN THE MATTER OF ELIZABETH VISBECK AN ALLEGED INCOMPETENT.
Superior Court of New Jersey, Chancery Division Morris County.
February 4, 1986.
*529 Donald A. Kessler for plaintiff Chilton Memorial Hospital (Nochimson, Schablik, Kessler & Finestein, attorneys.)
James R. Heaney for patient Elizabeth Visbeck.
Herbert W. Irwin and August Soltis for patient's son, Henry Visbeck.
STANTON, A.J.S.C.
The question presented in this case is whether a feeding tube should be surgically implanted in the stomach of a 90-year old patient who has suffered a severely disabling stroke. Without the feeding tube, the patient will suffer death from dehydration and starvation. With the tube, the nutritional needs of the patient will be fully met, although she will remain permanently in very poor physical and mental condition. Under the particular circumstances of this case, I have decided that the feeding tube should be implanted.
*530 This action was instituted by Chilton Memorial Hospital, which is located in Pompton Plains, Morris County, New Jersey. Elizabeth Visbeck, a 90-year old woman had originally been admitted to that hospital in August 1985 suffering from congestive heart failure and auricular fibrillation. At that time a pacemaker was implanted and Mrs. Visbeck was discharged from the hospital in satisfactory condition. On November 6, 1985, Mrs. Visbeck was admitted to Chilton Memorial Hospital complaining of shortness of breath. At the time of this admission, the patient was mentally alert and ambulatory. Her diagnosis on admission was congestive heart failure. On November 8, while in the hospital, the patient suffered an extensive right cerebral infarction, a massive stroke, which had a severely disabling impact. As a result of the stroke, Mrs. Visbeck lost much of her mental capacity, was paralyzed on the right side, was unable to speak, became incontinent of urine and feces, could not walk and lost the ability to swallow food or fluids. All of this was imposed upon an underlying serious heart condition and upon the general infirmities of very advanced age.
Shortly after she suffered the stroke, attending physicians inserted a nasogastric feeding tube through the patient's nose, down her esophagus and into her stomach. Mrs. Visbeck was successfully nourished through the nasogastric tube until January 23, 1986. On that date, the tube became clogged and had to be removed. Over the next two days, several different physicians made attempts to re-insert a nasogastric tube, but were unable to do so. Intravenous feeding was started. Intravenous feeding is not a long-term solution to the nutritional needs of a patient like Mrs. Visbeck who is unable to swallow. Enough fluids to prevent serious dehydration can be supplied intravenously. It is, however, impossible to supply enough calories intravenously to meet the minimum daily needs of a patient. There is a nutritional deficit and some loss of body mass every day. After several weeks or a month of intravenous feeding of a patient in Mrs. Visbeck's condition, the *531 cumulative loss would become critical and death would fairly shortly ensue. Furthermore, intravenous feeding imposes significant strains on the veins of a patient. They become, in effect, worn out and unable to absorb feeding. There is a serious risk that in much less than a month Mrs. Visbeck will not have any veins capable of handling intravenous feeding.
A few days after removal of the nasogastric feeding tube, Mrs. Visbeck's attending physicians decided that the only effective way to meet their patient's nutritional needs was to implant a feeding tube in her stomach. The surgical procedure involved is simple and can be performed under local anesthetic. Because they recognized that Mrs. Visbeck lacked the mental capacity to give an informed consent to the surgery, the physicians sought the consent of her son and only close relative, Henry Visbeck. The son's initial reaction to the proposed surgical implanting of a feeding tube was that it would amount to a wrongful prolonging of his mother's suffering. He refused permission for the operation. The hospital then instituted this action on January 28, 1986, seeking an adjudication that Elizabeth Visbeck was incompetent and asking for the appointment of a guardian who would consent to necessary medical treatment.
When I was informed early on the morning of January 28 that counsel for Chilton Memorial Hospital would appear in court at 1:30 p.m. to file a complaint and seek emergent relief, I immediately appointed an attorney to represent Elizabeth Visbeck and requested him to visit the patient and review her medical records. By the time the initial hearing in this matter opened on the afternoon of January 28, Mrs. Visbeck's attorney was in place, and he had visited his client, spoken with some of her care providers and reviewed some of her records. Counsel for Henry Visbeck was also present. At the hearing on January 28, I was presented with a complaint verified by Walter Jura, the Assistant Administrator of Chilton Memorial, and with many of the medical records of Elizabeth Visbeck. I also received a certification from Dr. Abhay Suda, the physician who is primarily responsible for Mrs. Visbeck's care. Dr. Suda is *532 board certified in internal medicine and endocrinology. I received a certification from Dr. Louis Chodosh, a consulting physician who is board certified in neurology and psychiatry. After reading the documentary evidence and hearing statements from all counsel at the initial hearing on January 28, I decided that a prompt final disposition of the case was necessary, but that a sound decision could not be made without taking live testimony and without my making a personal visit to the patient. Accordingly, I arranged a visit to Mrs. Visbeck during the afternoon of January 28 and scheduled a final plenary hearing for 9:00 a.m. on January 29.
On the night of January 28, Henry Visbeck visited his mother and gave further thought to her situation. He decided to change his mind and to consent to the surgical implanting of the feeding tube. When counsel informed me of this, I decided that we should nevertheless go forward with the hearing. For one thing, it seemed to be clear and undisputed that Mrs. Visbeck was not capable of making treatment decisions. It seemed desirable to have a formally appointed guardian in place to make decisions for her. In light of the past history of disagreement about Mrs. Visbeck's treatment, it seemed useful to have some directions from the court with respect to future treatment. All counsel agreed that a hearing and a judgment would be useful, even though there was current agreement about implanting the tube between the patient's physicians and her son. At the hearing on January 29, I took live testimony from the neurologist, Dr. Louis Chodosh, and from Henry Visbeck. All counsel made statements. At the end of the hearing, an oral opinion was rendered from the bench. A formal judgment was signed and issued on the morning of January 29.
The judgment declared that Elizabeth Visbeck was incompetent and that she lacked the capacity to make decisions about her medical treatment. Henry Visbeck was appointed guardian of the person and property of his mother. He was granted authority to make decisions about his mother's medical treatment, *533 including authority to make decisions about initiating, continuing, withholding or withdrawing life-supporting care. Although the judgment granted Mr. Visbeck general authority to make treatment decisions, it specifically directed him promptly to authorize the surgical implanting of the feeding tube. The judgment provided that changes in Mrs. Visbeck's mental condition or in her general physical condition, or a significant adverse reaction to the feeding tube, might justify removal of the tube in the near future or in the more distant future. So long as Elizabeth Visbeck is a patient at Chilton Memorial Hospital or at any other hospital, removal of the tube may not occur without agreement of the prognosis committee of the hospital. If Mrs. Visbeck leaves the hospital and goes to a nursing home, then, under the terms of the judgment, the tube may not be removed unless the procedures set forth in Matter of Conroy, 98 N.J. 321, 383-385 (1985), are followed.
This written opinion supersedes the oral opinion I delivered from the bench on January 29. It does not differ in substance from that opinion. It is intended to be a more careful articulation of the fact finding and reasoning contained in the oral opinion.
The key judicial decision in this area of concern is Matter of Conroy, 98 N.J. 321 (1985). In strict terms, Conroy is not controlling in our present case because it was specifically restricted to elderly nursing home residents suffering from serious and permanent mental and physical impairments, who will probably die within approximately one year even with treatment, and who, though formerly competent, are now incompetent to make decisions about life-sustaining treatment and are unlikely to regain such competence. Matter of Conroy, supra, 98 N.J. at 342. The New Jersey Supreme Court in Conroy was particularly concerned with the special problems of nursing home patients. Id. at 377-381. Since Mrs. Visbeck is a patient in a hospital rather than a nursing home, the holding in Conroy is not applicable to her. Nevertheless, the Supreme Court in Conroy gave careful consideration to many aspects of *534 this whole area of concern and its opinion contains the carefully considered and stated views of our highest New Jersey court on many of the crucial issues involved in all treatment decisions. A New Jersey trial court judge is obliged to give close attention to the views expressed by the Supreme Court in Conroy and to reflect upon them conscientiously in deciding cases which are broadly similar.
Perhaps the most important rule recognized in Conroy is the rule that a competent patient has the right to decide what medical treatment she will receive. This includes the right to refuse to have any medical treatment initiated or continued, even if such refusal means that death will ensue. Matter of Conroy, supra, 98 N.J. at 346-355. In particular, the competent patient's right to self-determination includes the right in circumstances such as those surrounding Mrs. Visbeck to have a feeding tube withheld or withdrawn. See Matter of Conroy, supra, 98 N.J. at 355.
If a patient becomes incompetent, she does not lose the right to accept or refuse medical treatment. An incompetent patient cannot directly exercise her right of self-determination, but substitute or surrogate decision-makers may make decisions for her. Matter of Conroy, supra, 98 N.J. at 356-368. In making a treatment decision for an incompetent patient, a substitute decision-maker must consider evidence of the patient's views as expressed during the time when she was competent. The substitute decision-maker must also carefully evaluate medical and other evidence bearing on the patient's condition, treatment and prognosis.
Elizabeth Visbeck's husband died many years ago. She has outlived all of her siblings and close friends. In recent years, she has lived with her only child, Henry Visbeck. Mr. Visbeck is a 68-year old man who has retired after many years of self-employment as a plumber. His testimony indicates that throughout his life he has had a close, affectionate and supportive relationship with his mother. Mr. Visbeck is a decent, *535 thoughtful, caring son who is mindful of his obligation to do what is best for his mother. He is not able to recall any expression of views by his mother on treatment issues. Elizabeth Visbeck has not signed a living will or other writing indicating her views. There is no course of action by her during competency which manifests any relevant views. In terms of evidence of her actual personal views, we simply do not know what Elizabeth Visbeck would decide about her treatment today if she were competent. Thus, we get no subjective indication in this case of what this patient would actually want for herself.
The evidence in this case establishes beyond any doubt that Mrs. Visbeck is incompetent and will remain so for the rest of her life. It is also clear that she lacks and will always lack the capacity to make any decision about tube feeding or any other treatment issue. These findings are based upon the hospital records, the certifications of Dr. Suda and Dr. Chodosh, the live testimony of Dr. Chodosh, the testimony of Henry Visbeck and my own direct observation of the patient.
The medical evidence reveals that Elizabeth Visbeck suffers from congestive heart failure; she still has fibrillation problems despite the presence of a pacemaker; she has received massive damage to the right side of her brain; she is paralyzed on the left side of her body; she is non-ambulatory; she is basically non-communicative; she is not able to swallow; she has no control of bowel or bladder functioning. None of these conditions is likely to improve in any significant way. The testimony of Dr. Chodosh leads me to believe that Mrs. Visbeck probably will not live for more than a few months, even if all her needs for nourishment are met. In short, this is a sadly impaired and desperately ill woman who will never get better.
However, Mrs. Visbeck has some appreciable awareness of her surroundings and some meaningful capacity to react to them. I will here relate my own observations of the patient which are consistent with all of the medical evidence in the *536 case. When I entered Mrs. Visbeck's hospital room she was sleeping quietly. As I approached the side of her bed, her eyes opened and reflected by movement that she was aware of my presence. This reaction was calm and appropriate and was not like the somewhat violent "startle reflex" which I have observed in a comatose patient. When the sheet and blanket covering Mrs. Visbeck were moved out of position by the nurse who was with me, Mrs. Visbeck returned them to their normal position with her right hand in a way which was measured and efficient. When I conversed with the nurse who was on the opposite side of the bed, Mrs. Visbeck moved her head and eyes, more or less appropriately  that is, she went back and forth between the nurse and me, depending upon who was talking, although there was a kind of delayed-reaction to her movements and a lack of exact correspondence between them and the conversational shifts. When I extended my right hand to her and asked her to grasp it, she did grasp it firmly. I cannot be sure whether she was responding to my oral request or to my hand movement, but she responded appropriately. When I asked her after a while to let go of my hand, she at first did not, but when I repeated the request several times, she let go of my hand in a way which I thought was purposeful. When I asked her simple questions, she made no reply, but while I was present she did attempt to speak. The sounds she uttered were not intelligible, but they were not mere moans or grunts. There was a pattern and structure to them which was linguistic in character. (Dr. Chodosh has not heard the patient speak distinct words. However, nurses who have more contact with her occasionally report distinct words or phrases, and Mr. Visbeck testified that his mother gave coherent answers to questions on the night of January 28.)
When I saw Mrs. Visbeck she was flat on her back in a relaxed, supple position. Her body appeared rather well fleshed out, in contrast to the very withered, almost skeletal, appearance of Claire Conroy which I observed as trial judge in the Conroy case. (For the trial court opinion in Conroy, see *537 188 N.J. Super. 523.) Mrs. Visbeck was being fed intravenously through her right leg. Her nurse told me that she could no longer receive feeding through her arms, and my observation of the discolored and deteriorated condition of the skin over the right arm veins corroborated that. A catheter is permanently inserted to draw off urine.
The conclusion I draw from the evidence and from my observations of Elizabeth Visbeck is that her mental processes are very limited, but she does have significant awareness of her surroundings and she has some limited ability to respond to them. She is not presently in pain, but she is capable of feeling pain. In the course of my judicial duties, I have seen hundreds of elderly mentally impaired patients. Mrs. Visbeck's mental condition is much worse than most of them, but it is markedly better than the mental condition I observed in Claire Conroy.
The general plight of Elizabeth Visbeck is sad indeed. She has vast mental and physical deficits, will never again function as an independent human being and will always be totally dependent on others for all of the most basic needs. It seems clear to me that many of us would prefer not to continue under such circumstances and would choose to forego feeding by tube. It also seems clear to me that such a choice would be a morally valid one, and that there is a definite legal right to make that choice. On the other hand, it seems clear to me that some people would choose to be fed by tube under these circumstances. It also seems clear to me that such a choice would be at least arguably sensible, that it would be a morally valid one, and that there is a definite legal right to make that choice.
There is a troublesome aspect to feeding tube cases which I think deserves some thought. Although respect for life is one of our most worthy human characteristics, and although the instinct to keep living is one of our strongest drives, there comes a time when each of us must die. Delaying that time by active medical treatment and by other active means makes *538 sense so long as there is some minimally acceptable quality to the life which is being prolonged. There comes some point at which virtually every reasonable person would call a halt to treatment. There is some point at which, in a very real sense, a person is supposed to die. I think that when massive and irreversible loss of the higher brain functions is followed by the permanent loss of ability to swallow we may be dealing with a natural and fitting closing down of the total human organism. I think that artificial feeding and other forms of active treatment are mandatory until we are sure that we are dealing with massive and irreversible loss of the higher brain functions. However, once we are sure that we are dealing with a massive and irreversible loss of the higher brain functions, I suggest that true decency might lead us to be very cautious about interfering with the natural closing down of the human body.
We have no evidence at all of what Elizabeth Visbeck, as a matter of her actual personal subjective views, would decide about the implanting of a feeding tube under the circumstances now confronting her. To the extent that the rules of the Supreme Court decision in Conroy may be controlling, we have, under the facts of our case, no basis to withhold treatment under the "limited-objective test." However, under Conroy, even where there is no evidence whatever of the patient's decision, it is sometimes possible for a substitute decision-maker to withhold or withdraw life-sustaining treatment if a "pure-objective test" is satisfied. The court described that test as follows:
"Under that test, as under the limited objective test, the net burdens of the patient's life with the treatment should clearly and markedly outweigh the benefits that the patient derives from life. Further, the recurring, unavoidable and severe pain of the patient's life with the treatment should be such that the effect of administering life-sustaining treatment would be inhumane."
[Conroy 98 N.J. at 366.]
In analyzing the quoted language and in reading further remarks of the Court on page 367 of the opinion, it becomes clear that treatment may not be withheld or withdrawn from an incompetent patient under Conroy (if the patient while competent *539 has not clearly indicated that she personally wants withholding or withdrawal), unless the patient is suffering from recurring, unavoidable and severe pain. With due respect to the court, I must say that I think that rule is wrong because it manifests a much too limited view of what is at stake in these cases. I say this, of course, in the interest of furthering discussion and thought about an important problem in the hope that a better resolution will be reached, and not by way of being inappropriately critical.
Many of our most debilitating illnesses do not involve pain at all. Even in those cases where the illness in question naturally involves severe pain, modern drug therapy often makes it possible to block the pain fully, or at least to the point where it is bearable. Although one always has to speak cautiously in these basic matters, I would suggest that suffering pain, even severe pain, is perhaps not the worst thing that can befall a human being. I would suggest that for most of us it would be far worse to suffer a very great loss of mental capacity, to become non-functioning, to be totally dependent upon others, to have no privacy in the most basic physical sense. These are quality of life considerations. They relate to the burdens that a patient bears and feels  or, at least, would feel if she were capable of feeling. It seems to me that it is essential to take those quality of life considerations into account in making health care decisions. An approach which eliminates them and considers only pain simply fails, in my judgment, to address the full range of human realities confronting a patient and other persons who find themselves in a situation such as that in which Mrs. Visbeck and those around her are at the present time.
In 1983, the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research issued a report entitled DECIDING TO FOREGO LIFE-SUSTAINING TREATMENT, Ethical, Medical and Legal Issues in Treatment Decisions. At page 135 of its report, the President's *540 Commission indicated its support for considering quality of life factors in these terms:
In assessing whether a procedure or course of treatment would be in a patient's best interests, the surrogate must take into account such factors as the relief of suffering, the preservation or restoration of functioning, and the quality as well as the extent of life sustained. An accurate assessment will encompass consideration of the satisfaction of present desires, the opportunities for future satisfactions, and the possibility of developing or regaining the capacity for self-determination.
It seems to me that the Supreme Court in Conroy may have missed the point of what quality of life considerations are about when it characterized them in these terms:
Although we are condoning a restricted evaluation of the nature of a patient's life in terms of pain, suffering, and possible enjoyment under the limited-objective and pure-objective tests, we expressly decline to authorize decision-making based on assessments of the personal worth or social utility of another's life, or the value of that life to others. We do not believe that it would be appropriate for a court to designate a person with the authority to determine that someone else's life is not worth living simply because, to that person, the patient's "quality of life" or value to society seems negligible. [Conroy, 98 N.J. at 367.]
Responsible people who believe that quality of life factors should be considered are not talking about the social utility of a patient's life or the value of the patient's life to others. They are looking at the matter from the viewpoint of the patient herself. They are thinking about whether the patient's life has meaning for the patient herself, whether it has become impossibly burdensome to the patient herself. See the concurring and dissenting opinion of Justice Handler in Conroy, 98 N.J. at 388.
The Supreme Court in Conroy was concerned that allowing decisions to be made by substitute decision-makers on the basis of quality of life factors "would create an intolerable risk for socially isolated and defenseless people suffering from physical or mental handicaps." Id. at 367. There are undoubtedly risks involved. Sometimes the risk might be as crude and as potentially sinister as the desire to inherit wealth. (I note that this risk is not present in our case, because Mrs. Visbeck's assets are negligible and her son's general motivation is excellent.) More often, the risk would come from the frustrations, aggravations *541 and burdens that dealing with a mentally impaired person poses for those around a patient. I think the way to deal with that risk is by being conscious of it and alert to it. In individual cases, health care providers and courts have to be wary about idiosyncratic decisions made by surrogates. Decisions to terminate treatment on quality of life grounds must be sustainable by reference to very widely held criteria. See President's Commission Report at 135. This reference is by no means a meaningless limitation. In this particular case, I would choose non-treatment for myself if I were in Mrs. Visbeck's position. But I would not impose that choice on another, or allow that choice to be imposed upon another, because I recognize that the quality of Mrs. Visbeck's life at present is sufficiently high to make the withholding of feeding by tube unacceptable to many responsible and caring people. Also, in terms of my own judicial thinking, the intrinsic moral validity of withholding feeding for another person of Mrs. Visbeck's level of awareness is doubtful. I note that the controls built into the judgment in this case are designed to protect Mrs. Visbeck from a decision by her guardian that is not sustainable on grounds much wider than his personal views. He will be required to obtain the agreement of a hospital prognosis committee to remove the feeding tube if Mrs. Visbeck remains in a hospital, or he will be required to obtain the agreement of the ombudsman for the elderly, the attending physician, and outside physicians if she moves to a nursing home.
The fact that there is a real risk of making bad decisions if we allow quality of life factors to be considered should not lead us to exclude those factors. For most people, those factors are probably the most important factors involved. To exclude even the consideration of them is to misstate the whole problem and to fail to come to grips with the true human reality of what is involved in these cases. If we require treatment decisions to be made without any reference to quality of life factors, we will be creating other kinds of risks of bad decision making. Worse than that, we will be guaranteeing that bad decisions will be *542 made and that large numbers of people will be thoughtlessly and automatically compelled to continue lives of intolerable bleakness.
Despite all of her serious mental and physical problems and her short life-expectancy, there is a positive quality to Elizabeth Visbeck's life in terms of awareness, responsiveness and minimal comfort. The proposed surgical implanting is a simple procedure, which will probably not be accompanied by significant pain. It is expected that ongoing use of the tube will not be uncomfortable for the patient. The health care providers see positive value to the feeding and Henry Visbeck currently agrees with them. Under all of these circumstances, and given the fact that she has not manifested while competent a choice for non-feeding under these circumstances, I think that the proper course is to implant the tube and feed through it. I note that I would reach that conclusion even if Mrs. Visbeck's son did not agree with it.
As recognized by the judgment entered in this action, changes in Elizabeth Visbeck's mental condition or in her physical condition, or a significant adverse reaction to the tube or to feeding through it, might justify withdrawal of the tube in the near future or in the more distant future. There is no point in speculating now about possible future changes or reactions.
I do not regard the fact that Henry Visbeck has changed his mind about his mother's treatment as reflecting adversely on his ability to function properly as his mother's guardian. The reality is that this is a difficult situation. It is understandable that a person's views might change as he grapples with the issues and facts involved in it. Indeed, the change occurring here represents, I think, a commendable openness and sensitivity. Mr. Visbeck is a fit and proper person to serve as guardian.
The judgment entered herein on January 29, 1986 remains in force for the reasons stated in this opinion.