*In re* ROSEBUSH

Docket No. 111082. Submitted October 8, 1991, at Detroit. Decided
September 8, 1992, at 9:15 A.M.

Francis and Jacqueline Rosebush petitioned the Oakland Circuit
Court for an order allowing the discontinuance of artificial
means of life support for their minor daughter, Joelle Rose-
bush. The Oakland County Prosecutor, who earlier obtained a
preliminary injunction against such action, responded in oppo-
sition. Joelle, at age ten, had been left in a persistent vegeta-
tive state after her spinal cord was severed and she suffered a
heart attack as a result of trauma sustained in an automobile
accident. Although her brain stem was not destroyed and she
was not "brain dead" as defined by MCL 333.1021 *et seq.*; MSA
14.15(1021) *et seq.*, her physicians believed that she would
never regain consciousness or be able to breathe on her own.
The court, Richard D. Kuhn, J., entered the order sought by
the petitioners. The prosecutor appealed.

The Court of Appeals *held:*

Minors and other legally incompetent individuals have the
right to decline life-sustaining medical treatment. The parents
of a minor may act as surrogates in the exercise of that right
upon considering the minor's expressed preference, if any, or
best interests. Judicial involvement in the decision to withhold
or withdraw life-sustaining treatment for a minor need occur
only where the parties directly concerned disagree about treat-
ment, or where other appropriate reasons are established for a
court's involvement.

1. Michigan recognizes and adheres to the common-law doc-
trine of informed consent, a logical corollary of which provides
that a person has the right to decline any and all forms of
medical intervention, including lifesaving or life-prolonging
treatment. The right to refuse lifesaving medical treatment is
not lost because of incompetence or youth. Inasmuch as minors
lack the legal capacity to make decisions concerning their

REFERENCES

Am Jur 2d, Death §§ 578, 605.
Power of court to order or authorize discontinuation of extraordi-
nary medical means of sustaining human life. 79 ALR3d 237.

medical treatment and their parents speak for them in matters of medical treatment, parents may act as their minor children's surrogates in making decisions concerning treatment, including the decision whether to withdraw or withhold lifesaving or life-prolonging measures.

2. It is the public policy of this state to respect the roles played by patient, family, physician, and spiritual adviser in the process of deciding medical treatment. Accordingly, judicial intervention in the process of deciding whether to withhold or withdraw life-sustaining treatment for a minor is proper only where there is disagreement among parties directly concerned, or where compelled by other appropriate reasons.

3. The parents of a minor, in deciding whether life-sustaining treatment should be withheld or withdrawn, are subject either to the "substituted judgment" standard or the "best interests" standard. Where the minor was of mature judgment and it can be ascertained what choice the minor would have made, the substituted judgment standard applies, and the parents must make the decision on the basis of what the minor would have decided if able to do so. Where the minor was immature and it cannot be ascertained what choice the minor would have made, the parents must make a good-faith determination of whether the withholding of life-sustaining treatment would serve the minor's best interests. Factors relevant to that determination include, but are not limited to: the minor's present level of physical, sensory, emotional, and cognitive functioning; the degree of physical pain resulting from the medical condition, treatment, and termination of the treatment; the degree of humiliation, dependence, and loss of dignity probably resulting from the condition and treatment; the life expectancy and prognosis for recovery with and without treatment; various treatment options; and the risks, side effects, and benefits of each of those options.

4. MCL 333.1021 et seq.; MSA 14.15(1021) et seq., which provides that death of a person receiving life-sustaining treatment occurs upon the irreversible cessation of spontaneous brain functions, governs the determination of when such a person dies. The act does not prevent the removal of life-support apparatus until the patient has been declared brain dead.

5. Criminal liability for homicide may not be imposed on the parents or the physician of a minor from whom life-sustaining medical treatment is withheld. Criminal agency as the cause of death, a necessary element of homicide, is lacking in such instance because the decision to withhold treatment is autho-

rized under common law and the withholding of life-sustaining treatment does not cause death, but merely allows the injury or illness to take its natural and inevitable course.

Affirmed.

SAWYER, J., dissenting in part, stated that the formulation of guidelines for the removal of life-support systems in cases other than this is a legislative function that the judiciary, pursuant to the constitutional principle of separation of powers, should not undertake.

PARENT AND CHILD — MEDICAL TREATMENT OF MINORS — WITHHOLDING OR WITHDRAWAL OF LIFE-SUSTAINING TREATMENT.

The common-law doctrine of informed consent accords the parents of a minor the right to determine whether life-sustaining treatment should be withheld or withdrawn from the minor; in making a decision, the parents should consider the minor's preference or best interests; judicial involvement in the decision-making process may occur only where the parties directly concerned disagree about treatment, or where other appropriate reasons compel such involvement.

*Vlcko, Lane, Payne & Broder, P.C.* (by *Andrew J. Broder* and *Lynn Stevens Naoum*), for the petitioners.

*Richard Thompson,* Prosecuting Attorney, *Robert C. Williams,* Chief, Appellate Division, and *Michael J. Modelski,* Assistant Prosecuting Attorney, for the respondent.

Amici Curiae:

*Joseph P. Zanglin,* for Right to Life of Michigan, Inc.

*Kerr, Russell & Weber* (by *Richard D. Weber* and *Joanne Geha Swanson*), for Michigan State Medical Society.

*Dykema Gossett* (by *Bettye S. Elkins, Kathleen McCree Lewis, Teresa A. Brooks,* and *Daniel R. Shemke*), for Michigan Hospital Association.

*Jaffe, Snider, Raitt & Heuer, P.C.* (by *Brian G. Shannon*), for American Academy of Neurology.

*Giles R. Scofield* and *Fenella Rouse* (*Groves, Decker & Wyatt* by *David M. McCleary*, of Counsel), for Society for the Right to Die, Inc., and Concern for Dying, Inc.

Before: MACKENZIE, P.J., and SAWYER and JANSEN, JJ.

MACKENZIE, P.J. This is an appeal from an order allowing petitioners, the parents of Joelle Rosebush, to authorize the removal of life-support systems for their minor daughter. Although the issues raised in this appeal were rendered technically moot upon Joelle's death, appellate review is nevertheless appropriate because the issues involve questions of public significance that may recur and yet evade review. *Highland Recreation Defense Foundation v Natural Resources Comm,* 180 Mich App 324, 327; 446 NW2d 895 (1989). See also *In re LHR,* 253 Ga 439; 321 SE2d 716 (1984); *In re Lawrance,* 579 NE2d 32, 37 (Ind, 1991); *In re Guardianship of Hamlin,* 102 Wash 2d 810; 689 P2d 1372 (1984).

I

Joelle Rosebush was born on May 20, 1976. On January 12, 1987, she was involved in a traffic accident. Her spinal cord was severed at the C-1 level, just below the skull, and she went into cardiac arrest. The spinal cord injury left Joelle completely and irreversibly paralyzed from the neck down and unable to breathe without a respirator. The lack of oxygen during cardiac arrest destroyed most, if not all, of Joelle's cerebral functions, and left her in a persistent vegetative

state. It was uncontroverted that Joelle would never regain consciousness and would never be able to breathe on her own. Joelle's brain stem was not destroyed, however, and her injuries did not leave her "brain dead" as defined under Michigan law. See MCL 333.1021 *et seq.*; MSA 14.15(1021) *et seq.*

Joelle was hospitalized at William Beaumont Hospital of Royal Oak until June, 1987. In spite of the prognosis of no recovery and Joelle's steadily deteriorating condition, petitioners, hopeful of future improvement in Joelle's condition, rejected the option of discontinuing life-support at that time. Joelle was then moved to the Neurorehabilitation Center at the Georgian Bloomfield Nursing Home. By March 1988, it became clear to petitioners that Joelle's condition had not improved and that she would never progress from her vegetative condition. Petitioners then decided to authorize the removal of life-support systems. This decision was made after consultation with Joelle's treating physicians, the staff of the Neurorehabilitation Center, the family's Catholic priest, and the family's attorney.

In March 1988, Joelle's medical case manager sought the assistance of doctors at Children's Hospital of Michigan—Detroit in effectuating petitioners' decision to discontinue life-support. The bioethics committee at Children's Hospital subsequently authorized Joelle's transfer to that facility for further evaluation. The transfer was blocked, however, after staff members at the Neurorehabilitation Center contacted respondent, who obtained an ex parte temporary restraining order, and later a preliminary injunction, prohibiting Joelle's transfer or the removal of life-support systems.

Following seven days of trial, the court dissolved the preliminary injunction and authorized peti-

tioners "to make any and all decisions regarding the medical treatment received by their daughter, including but not limited to, the authority to order the removal of the ventilator that sustains Joelle's respiratory functions." Joelle died on August 13, 1988, shortly after her respirator was deactivated.

## II

### A

Courts variously have found a right to forego life-sustaining medical treatment on the basis of three sources: (1) the common-law right to freedom from unwanted interference with bodily integrity, (2) the constitutional right to privacy or liberty, or (3) statute. See generally, Meisel, *The Right to Die* (New York: Wiley Law Publications, 1989), pp 49-54. We hold that, in Michigan, there is a right to withhold or withdraw life-sustaining medical treatment as an aspect of the common-law doctrine of informed consent.[1] The trial court did not err in determining that petitioners had the legal authority to order the removal of life-support systems.

### B

Michigan recognizes and adheres to the common-law right to be free from nonconsensual physical invasions and the corollary doctrine of informed consent. Accordingly, if a physician treats or operates on a patient without consent, the physician has committed a battery and may be required to respond in damages. *Zoski v Gaines,* 271 Mich 1, 9-10; 260 NW 99 (1935); *Young v*

---

[1] This disposition makes it unnecessary to decide the validity of the constitutional or statutory bases in Michigan.

*Oakland Gen Hosp,* 175 Mich App 132, 139; 437 NW2d 321 (1989); *Banks v Wittenberg,* 82 Mich App 274, 279-280; 266 NW2d 788 (1978).

The logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, the right to refuse medical treatment and procedures. *Werth v Taylor,* 190 Mich App 141, 145; 475 NW2d 426 (1991). Thus, a competent adult patient has the right to decline any and all forms of medical intervention, including lifesaving or life-prolonging treatment. *Id.,* citing *Cruzan v Director, Missouri Health Dep't,* 497 US —; 110 S Ct 2841; 111 L Ed 2d 224 (1990), and *In re Quinlan,* 70 NJ 10; 355 A2d 647 (1976).[2]

The right to refuse lifesaving medical treatment is not lost because of the incompetence or the

---

[2] It is generally recognized, however, that the right to refuse life-sustaining treatment may, in rare cases, be outweighed by countervailing state interests. Four such state interests have been identified: (1) the preservation of life, (2) the protection of innocent third parties, (3) the prevention of suicide, and (4) the maintenance of the ethical integrity of the medical profession. See *In re Guardianship of Grant,* 109 Wash 2d 545; 747 P2d 445 (1987), modified 757 P2d 534 (1988); Meisel, *supra,* pp 96-100; anno: *Judicial power to order discontinuance of life-sustaining treatment,* 48 ALR4th 67. Nevertheless, when dealing with incompetent patients for whom there is no medical probability of substantial recovery, as in this case, courts have found that countervailing state interests do not preclude recognition of the right to have life-sustaining treatment discontinued. "Therefore, the state's interest in the preservation of life has been held to be insufficient to outweigh the individual right where the life which would be preserved would be one in a merely vegetative state or one enduring only a prolonged process of dying . . . and the state interest in the prevention of suicide has been seen as inapplicable or insignificant where there was no intent to die and where death would be the result of natural processes. . . . Similarly, the state interest in the protection of third parties has been held to be inapplicable or insignificant where no third parties were dependent upon the patient in question or where affected third parties themselves supported termination of treatment. . . . Finally, the state's interest in maintaining the ethical integrity of the medical profession has been held not to preclude recognition of an individual's right to discontinuance of life-sustaining treatment where prevailing standards of medical ethics do not condemn the contemplated course of action." 48 ALR4th, p 73.

youth of the patient. *In re LHR, supra,* p 446.[3]
However, because minors and other incompetent
patients lack the legal capacity to make decisions
concerning their medical treatment, someone act-
ing as a surrogate must exercise the right to
refuse treatment on their behalf.[4] See generally,
Meisel, *supra,* chs 8 and 13; *Guidelines for State
Court Decision Making in Authorizing or With-
holding Life-Sustaining Medical Treatment* (Wil-
liamsburg, Va: National Center for State Courts,
1991); Younger, ed, *Hospital Law Manual, Attor-
ney's Volume, Volume II,* Dying, Death, and Dead
Bodies, pp 28-35 (Rockville, Md: Aspen Publishers,
Inc, 1992); anno: *Judicial power to order discon-
tinuance of life-sustaining treatment,* 48 ALR4th
67.

---

[3] See also *In re Guardianship of Grant, supra; Gray v Romeo,* 697 F
Supp 580 (D RI, 1988); *Rasmussen v Fleming,* 154 Ariz 207; 741 P2d
674 (1987); *Foody v Manchester Memorial Hosp,* 40 Conn Super 127;
482 A2d 713 (1984); *In re AC,* 573 A2d 1235, 1247 (DC App, 1990); *In
re Guardianship of Browning,* 568 So 2d 4 (Fla, 1990); *John F
Kennedy Memorial Hosp v Bludworth,* 452 So 2d 921 (Fla, 1984);
*Corbett v D'Alessandro,* 487 So 2d 368 (Fla App, 1986), review den 492
So 2d 1331 (Fla, 1986); *Brophy v New England Sinai Hosp, Inc,* 398
Mass 417; 497 NE2d 626 (1986); *In re Spring,* 380 Mass 629; 405 NE2d
115 (1980); *In re Jobes,* 108 NJ 394; 529 A2d 434 (1987); *In re Peter,*
108 NJ 365; 529 A2d 419 (1987); *In re Visbeck,* 210 NJ Super 527; 510
A2d 125 (Ch Div, 1986); *In re Colyer,* 99 Wash 2d 114; 660 P2d 738
(1983); *Barber v Superior Court,* 147 Cal App 3d 1006; 195 Cal Rptr
484 (1983); *Severns v Wilmington Medical Center, Inc,* 421 A2d 1334
(Del, 1980); *In re Guardianship of Barry,* 445 So 2d 365 (Fla App,
1984); *In re PVW,* 424 So 2d 1015 (La, 1982); *Custody of a Minor,* 385
Mass 697; 434 NE2d 601 (1982); *In re Hier,* 18 Mass App 200; 464
NE2d 959 (1984), review den 392 Mass 1102; 465 NE2d 261 (1984); *In
re Conservatorship of Torres,* 357 NW2d 332 (Minn, 1984); *In re
Clark,* 210 NJ Super 548; 510 A2d 136 (Ch Div, 1986); *Leach v Akron
Gen Medical Center,* 68 Ohio Misc 1; 426 NE2d 809 (1980); *In re
Guardianship of Ingram,* 102 Wash 2d 827; 689 P2d 1363 (1984); *In re
Guardianship of Hamlin, supra; In re Lawrance, supra.*

[4] The advance directive of a mature minor, stating the desire that
life-sustaining treatment be refused, should be taken into considera-
tion or enforced when deciding whether to terminate the minor's life-
support treatment or refuse medical treatment. See *In re Swan,* 569
A2d 1202 (Me, 1990); *In re EG,* 133 Ill 2d 98; 139 Ill Dec 810; 549
NE2d 322 (1989). Cf. *Bakker v Welsh,* 144 Mich 632; 108 NW 94
(1906).

It is well established that parents speak for their minor children in matters of medical treatment. See *Parham v JR,* 442 US 584; 99 S Ct 2493; 61 L Ed 2d 101 (1979); *Zoski, supra; Bakker v Welsh,* 144 Mich 632; 108 NW 94 (1906). Because medical treatment includes the decision to decline lifesaving intervention, *Werth, supra,* it follows that parents are empowered to make decisions regarding withdrawal or withholding of lifesaving or life-prolonging measures on behalf of their children.[5]

C

Having determined that minors have the same right to decline life-sustaining treatment as their competent adult counterparts, and that parents may act as surrogate decision makers to exercise that right, we next consider what restrictions, if any, should be placed on the parents' decision-making authority and what role, if any, the courts should play in the decision-making process. We hold that the decision-making process should generally occur in the clinical setting without resort to the courts, but that courts should be available to assist in decision making when an impasse is reached. We further hold that, in making decisions for minors or other incompetent, patients, surrogate decision makers should make the best approximation of the patient's preference on the basis of available evidence; if such preference was never expressed or is otherwise unknown, the surrogate should make a decision based on the best interests of the patient.

[5] See generally, Meisel, *supra,* ch 13. Of course, where the parents of a minor child for some reason are themselves incompetent to act as surrogate decision makers, and other family members are unavailable or unwilling to act as surrogates, a guardian should be appointed to exercise the minor's rights on behalf of the minor. See Meisel, *supra,* p 417.

D

Our research has found two cases involving the discontinuation of life-sustaining treatment for minor children who were in a persistent vegetative state.[6] In *In re Guardianship of Barry,* 445 So 2d 365 (Fla App, 1984), the parents petitioned to terminate life-support systems for their ten-month-old son, who was permanently comatose. The circuit court granted the petition, and the Florida Court of Appeals affirmed. In so doing, the court stated:

> Where, as here, the parents' informed decision is backed by uncontroverted medical evidence that their young child is terminally ill and that his condition is incurable and irreversible, their decision, we think, overrides any interest of the state in prolonging their child's life through extraordinary measures. We can conceive of no state interest great enough to compel the parents to continue to submit their child to a life support system in this instance. To do so would merely prolong the death of a child terminally ill, wholly lacking in cognitive brain functioning, completely unaware of his surroundings, and with no hope of development of any awareness. The means now being employed are measures which even the physicians testified they would not now initiate given their present knowledge of the situation. It is, we think, the right and the obligation of the parents in such an instance to exercise their responsibility and prerogative, as did Mr. and Mrs. Barry, of making an informed determination as to whether these extraordinary measures should be continued. See *In re Quinlan.* [445 So 2d 371.]

[6] A third case, *In re PVW,* 424 So 2d 1015 (La, 1982), also concerned the removal of a permanently comatose minor from life-support systems. That case is inapposite to this case, however, because it primarily involved the construction of a Louisiana statute allowing the discontinuation of life-support treatment under certain circumstances.

The *Barry* court rejected the state's request that judicial review be required before life-support methods may be withheld from a minor who is not brain dead:

> [W]here, as here, the question concerns a young child, we do not think the parents must always qualify as legal guardians and seek judicial sanctions to discontinue these extraordinary measures. A decision by parents supported by competent medical advice . . . should ordinarily be sufficient without court approval. Of course, diagnosis should always be confirmed by at least two physicians. We must remember that the conscience of society in these matters is not something relegated to the exclusive jurisdiction of the court.
>
> Although judicial intervention need not be solicited as a matter of course, still the courts must always be open to hear these matters on request of the family, guardian, affected medical personnel, or the state. In cases where doubt exists, or there is a lack of concurrence among family, physicians, and the hospital, or if an affected party simply desires a judicial order, then the court must be available to consider the matter. Medical personnel and hospitals may well consider the suggestion made by Dr. Solomon in his testimony that an advisory committee should be available to assist families and physicians in these matters. [445 So 2d 372.]

In *In re LHR, supra,* the parents of an infant in an irreversible chronic vegetative state sought to remove life-support systems from the child, and the hospital treating the child sought a declaratory judgment regarding whether life-support activity could be terminated. The Supreme Court of Georgia concluded that it could, stating:

> We conclude that the right to refuse treatment or indeed to terminate treatment may be exercised

by the parents or legal guardian of the infant after diagnosis that the infant is terminally ill with no hope of recovery and that the infant exists in a chronic vegetative state with no reasonable possibility of attaining cognitive function. The above diagnosis and prognosis must be made by the attending physician. Two physicians with no interest in the outcome of the case must concur in the diagnosis and prognosis. Although prior judicial approval is not required, the courts remain available in the event of disagreement between the parties, any case of suspected abuse, or other appropriate instances.

In the narrow case before us no hospital ethics committee need be consulted. This in no way forecloses use of such a committee if this is the choice of the hospital, physician or family. Once the diagnosis is made that the infant is terminally ill with no hope of recovery and in a chronic vegetative state with no possibility of attaining cognitive function, the state has no compelling interest in maintaining life. The decision to forego or terminate life-support measures is, at this point, simply a decision that the dying process will not be artificially extended. While the state has an interest in the prolongation of life, the state has no interest in the prolongation of dying, and although there is a moral and ethical decision to be made to end the process, that decision can be made only by the surrogate of the infant. Since the parents are the natural guardians of the infant, where there are parents no legal guardian and no guardian ad litem need be appointed.

We conclude that the decision whether to end the dying process is a personal decision for family members or those who bear a legal responsibility for the patient. We do not consider this conclusion an abdication of responsibility of the judiciary. While the courts are always available to protect the rights of the individual, the condition of this individual is such that the decision is one to be made by the family and the medical community. As previously noted, the courts remain open to

assist if there is disagreement between decision makers or question of abuse. [253 Ga 446-447.]

See also Meisel, *supra,* chs 6 and 8; *Guidelines for State Court Decision Making, supra,* pp 101-122. But see *Superintendent of Belchertown State School v Saikewicz,* 373 Mass 728; 370 NE2d 417 (1977).

We agree with the principles set forth in *Barry* and *In re LHR.* After the trial court's decision in this case, our Legislature enacted MCL 700.496; MSA 27.5496, which allows competent adults to appoint a patient advocate to make medical-treatment decisions, including the withdrawal of life-sustaining treatment, on their behalf. While the statute provides for judicial intervention under certain limited circumstances, we believe that this legislation demonstrates that the overriding public policy of this state is to respect the roles played by the patient, family, physicians, and spiritual advisors in the making of decisions regarding medical treatment, as well as the policy that courts need not delve into that decision-making process unless necessary to protect the patient's interests. Although the legislation applies only to competent adults, we are satisfied that the public policy of judicial nonintervention also extends to decisions concerning the medical treatment of incompetent persons and minors. *In re LHR, supra.* We therefore hold that, in general, judicial involvement in the decision to withhold or withdraw life-sustaining treatment on behalf of a minor or other incompetent patient need occur only when the parties directly concerned disagree about treatment, or other appropriate reasons are established for the court's involvement. See *Guidelines for State Court Decision Making, supra,* pp 101-122.

E

While the decision of a competent adult patient regarding the cessation of life-sustaining measures will generally control that patient's care, a different standard must necessarily guide the surrogate of an incompetent patient, including the parent of an immature minor child, where the incompetent or the minor has never expressed his wishes. Two basic standards have evolved for surrogates to decide whether to withdraw or withhold consent to life-sustaining treatment: the "substituted judgment" standard and the "best interests" standard.[7] See generally, *Guidelines for State Court Decision Making, supra,* pp 72-78; Meisel, *supra,* ch 9.

Under the substituted judgment standard, the surrogate exercising an incompetent patient's rights must make the decision whether to forego life-sustaining treatment on the basis of what the patient would have decided had the patient been able to do so. Meisel, *supra,* p 278. The parameters of the standard were concisely set forth in *In re Conroy,* 98 NJ 321, 365; 486 A2d 1209 (1985):

> Under the limited-objective test, life-sustaining treatment may be withheld or withdrawn from a patient in Claire Conroy's situation when there is some trustworthy evidence that the patient would have refused the treatment, and the decision-maker is satisfied that it is clear that the burdens outweigh the benefits of that life for him. By this we mean that the patient is suffering, and will continue to suffer throughout the expected dura-

---

[7] Respondent suggests a third standard, based on the presence of clear and convincing evidence that the incompetent patient made a firm and informed decision, while competent, to forego life-sustaining treatment under similar circumstances. We summarily reject this standard, because its adoption would always preclude the termination of life-support efforts for minors and other persons who have never been legally competent, in direct contradiction of the right to refuse medical treatment. Compare *In re Guardianship of Hamlin, supra.*

tion of his life, unavoidable pain, and that the net burdens of his prolonged life (the pain and suffering of his life with the treatment less the amount and duration of pain that the patient would likely experience if the treatment were withdrawn) markedly outweigh any physical pleasure, emotional enjoyment, or intellectual satisfaction that the patient may still be able to derive from life. This limited-objective standard permits the termination of treatment for a patient who had not unequivocally expressed his desires before becoming incompetent, when it is clear that the treatment in question would merely prolong the patient's suffering.

Under the proper circumstances—where a patient was formerly competent or is a minor of mature judgment—the substituted judgment standard is an appropriate test. See *Guidelines for State Court Decision Making, supra,* pp 72-83. However, as applied to immature minors and other never-competent patients, the substituted judgment standard is inappropriate because it cannot be ascertained what choice the patient would have made if competent. Meisel, *supra,* p 275. See also *In re Guardianship of Barry, supra,* pp 370-371; *In re LHR, supra,* p 444; *Rasmussen v Fleming,* 154 Ariz 207; 741 P2d 674 (1987). We therefore conclude that, where the patient has never been competent, the decision-making test that better guides the surrogate is the best interests standard.

The best interests standard was summarized in *In re Guardianship of Grant, supra,* as follows:

There will be many situations where it cannot be ascertained what choice the patient would make if competent. In such cases, the guardian must make a good-faith determination of whether the withholding of life sustaining treatment would

serve the incompetent patient's best interests. The
following is a nonexclusive list of the factors which
should be considered in making this determina-
tion:

[E]vidence about the patient's present level of
physical, sensory, emotional, and cognitive func-
tioning; the degree of physical pain resulting from
the medical condition, treatment, and termination
of the treatment, respectively; the degree of humil-
iation, dependence, and loss of dignity probably
resulting from the condition and treatment; the
life expectancy and prognosis for recovery with
and without treatment; the various treatment op-
tions; and the risks, side effects, and benefits of
each of those options.
*Conroy,* 98 NJ at 397, 486 A2d 1209 (Handler, J.
concurring in part and dissenting in part). [109
Wash 2d 567-568.]

The trial court in this case properly recognized the
best interests standard as an appropriate standard
to use in deciding whether to remove life-support
systems for Joelle.

III

Respondent has suggested that the determina-
tion of death act, MCL 333.1021 *et seq.;* MSA
14.15(1021) *et seq.,* precludes the removal of a
patient's life-support apparatus until after the
patient has been determined to be brain dead. We
agree with the trial court's conclusion, that "the
statute only addresses one question: is the patient
dead, so that life-support may be disconnected
without fear of liability?"

The determination of death act provides:

A person will be considered dead if in the an-
nounced opinion of a physician, based on ordinary
standards of medical practice in the community,
there is the irreversible cessation of spontaneous

respiratory and circulatory functions. If artificial means of support preclude a determination that these functions have ceased, a person will be considered dead if in the announced opinion of a physician, based on ordinary standards of medical practice in the community, there is the irreversible cessation of spontaneous brain functions. Death will have occurred at the time when the relevant functions ceased. [MCL 333.1021; MSA 14.15(1021).]

Death is to be pronounced before artificial means of supporting respiratory and circulatory functions are terminated. [MCL 333.1022; MSA 14.15(1022).]

The means of determining death in section 1 shall be used for all purposes in this state, including the trials of civil and criminal cases. [MCL 333.1023; MSA 14.15(1023).]

Courts may look to the legislative history of an act, as well as the time during which the act was passed, to ascertain the reason for the act and the meaning of its provisions. *People v Hall*, 391 Mich 175, 191; 215 NW2d 166 (1974). In the case of the determination of death act, the legislation was a response to the problem that, with the advances in life-sustaining medical technology, the traditional indicia of death—lack of pulse or breathing—were no longer meaningful when artificial life-support means were used. "[T]he concern of the drafters, as evinced by the legislative history cited to the court, was to provide a clear benchmark, a bright line test to be used by physicians for determining the time of death of persons who are maintained on life-support apparatus." *Crobons v Wisconsin National Life Ins Co,* 594 F Supp 379, 384 (ED Mich, 1984), aff'd 790 F2d 475 (CA 6, 1986).

We hold that the determination of death act was intended only to determine when a person receiving life-sustaining treatment has died. It was not

intended to prevent the removal of life-support apparatus until a patient has been declared brain dead.

## IV

Respondent has also suggested that the termination of life-support treatment for Joelle should subject petitioners and Joelle's doctors to criminal liability for homicide.

No court has reached the conclusion that the withholding or withdrawal of life-sustaining measures should be a ground for imposition of criminal liability. Meisel, *supra*, pp 57-58; anno: *Homicide: Physician's withdrawal of life supports from comatose patient,* 47 ALR4th 18. See also Uniform Rights of the Terminally Ill Act, § 10(a), 9B ULA 609, 620. The trial court in this case declined to impose criminal liability, and we agree.

The corpus delicti of a felonious homicide consists of a death and the existence of criminal agency as its cause. *People v Mondich,* 234 Mich 590, 593-594; 208 NW 675 (1926). The decision to withdraw or withhold consent to life-sustaining treatment and the implementation of such a decision does not amount to criminal agency because the decision and its implementation are authorized under the common law. Moreover, the implementation of a decision to terminate life-support treatment is not the cause of the patient's subsequent death. Instead, the discontinuance of life-support measures merely allows the patient's injury or illness to take its natural and inevitable course. See *In re Guardianship of Grant, supra,* p 564. As stated in *In re Welfare of Colyer,* 99 Wash 2d 114, 123; 660 P2d 738 (1983), "[a] death which occurs after the removal of life sustaining systems is from natural causes, neither set in motion nor intended

by the patient" or the patient's surrogate. The trial court did not err in refusing to impose criminal liability for the removal of Joelle's life-support systems.

Affirmed.

JANSEN, J., concurred.

SAWYER, J. *(concurring in part and dissenting in part)*. While I agree that Judge Kuhn properly allowed removal of the life-support system in the case at bar, I cannot agree with the majority's formulation of guidelines to govern future cases of this nature.

It is a well-settled principle of constitutional law that government is divided into three branches: the legislative, executive, and judicial. Const 1963, art 3, § 2; *Int'l Union v Michigan,* 194 Mich App 489, 499; — NW2d — (1992). The Michigan Constitution provides that no person exercising the powers of one branch shall exercise powers properly belonging to one of the others, except as expressly provided. Const 1963, art 3, § 2. I believe that the majority's pronouncement of guidelines addressing cases beyond the one at bar is dangerously close to a usurpation of powers properly belonging to the Legislature. Accordingly, I would limit our holding in this case to the decision as it affects Joelle Rosebush.

Courts in foreign jurisdictions have recognized the unique policy and societal implications of removing the life-support system of a person in a persistant vegetative state. See *In re Conroy,* 98 NJ 321; 486 A2d 1209 (1985); *In re Storar,* 52 NY2d 363; 420 NE2d 64 (1981). Because of the complex and sensitive nature of issues that are related to the removal of life-support systems, these courts urged that judicial policy making give

way to the legislative process in order to insure that the interests of the constituency are served. *Id.* Similarly, this Court has recognized that where moral and public policy matters are at issue, intermediate appellate judges should forgo their desire to create new law in favor of the legislative process. *Proffitt v Bartolo,* 162 Mich App 35, 58; 412 NW2d 232 (1987) (evaluation of wrongful birth and life claims).

I believe that this case presents a task too large in scope and important in effect for this Court to establish guidelines that will dictate future activity in this area. Perhaps Justice POTTER best explained the separation of powers doctrine in *In re Fowarding Co,* 294 Mich 57; 292 NW 678 (1940), when he stated:

> There is a distinction between legislative and judicial acts. The Legislature makes the law—courts apply it. To enact laws is an exercise of legislative power; to interpret them is an exercise of judicial power. To declare what the law shall be is legislative; to declare what it is or has been is judicial. The legislative power prescribes rules of action. The judicial power determines whether, in a particular case, such rules of action have been transgressed. The legislature prescribes rules for the future. The judiciary ascertains existing rights. [*Forwarding, supra* at 63 (quoting from Justice POTTER's dissent in *In re Application of Consolidated Freight Co,* 265 Mich 340, 343; 251 NW 431 (1933).]

While I agree with the majority's recognition of the parental right to refuse medical treatment for an incompetent child, I hesitate to prescribe rules for future cases that concern such important public policy and societal concerns.